## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| DANIEL BRYAN, VICTOR CABALLERO, NATHAN DEW, MICHAEL LEPORE, STEPHANIE PAKE, CHARLES WILLIAMSON, BRANDON FISHER, MICHAEL GRUENKE, JOSHUA HAMMONS, DAVID NAVARRO, DANIELLE BELLER, and JACOB BENAVIDES, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.:<br><br>Hon.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FORD MOTOR COMPANY, | ) ) | |
| Defendant. | ) ) ) | |

## <u>CLASS ACTION COMPLAINT AND JURY DEMAND</u>

# CONTENTS

INTRODUCTION ................................................................................................1

JURISDICTION AND VENUE .........................................................................6

PARTIES............................................................................................................7

FACTUAL ALLEGATIONS ............................................................................41
    A.    Ford's Marketing of the F-150 .............................................41

    B.    Oil Consumption in the Class Vehicles ...............................45

    C.    The Oil Consumption Defect Damages Engine Parts and
          Vehicle Systems, Impairs Efficiency, and Causes Higher
          Emissions..............................................................................53

    D.    Ford's Longstanding Knowledge of the Defect ...................58

          1.    TSBs and SSMs Demonstrate Ford's Longstanding
                  Knowledge of Oil Consumption Issues in Its Vehicles............58
          2.    Numerous Reports to NHTSA Should Have Given Ford
                  Knowledge of the Oil Consumption Defect .............................64
          3.    Complaints on Heavily Trafficked Internet Forums for
                  Car Owners Should Have Given Ford Knowledge of the
                  Oil Consumption Defect ..........................................................74
          4.    Ford's Internal Testing Should Have Identified the Oil
                  Consumption Defect .................................................................76
    E.    Ford's Response to Consumers Presenting the Oil Consumption
          Defect at Ford Dealerships....................................................78

    F.    Ford's Efforts to Conceal the Defect from Consumers and
          Deflect Responsibility for Engine Problems onto Consumers ..........81

CLASS ALLEGATIONS ...................................................................................83

TOLLING OF STATUTES OF LIMITATION ..................................................87

CAUSES OF ACTION ......................................................................................88
    A.    Claims on Behalf of the Connecticut Class...........................88

B.      Claims on Behalf of the Kansas Class ................................................93

C.      Claims on Behalf of the Louisiana Class ..........................................100

D.      Claims on Behalf of the Michigan Class............................................103

E.      Claims on Behalf of the Mississippi Class.......................................109

F.      Claims on Behalf of the Missouri Class............................................112

G.      Claims on Behalf of the Kentucky Class ..........................................118

H.      Claims on Behalf of the California Class..........................................123

I.      Claims on Behalf of the Florida Class ..............................................133

PRAYER FOR RELIEF ........................................................................138

JURY DEMAND ..................................................................................140

Plaintiffs Daniel Bryan, Victor Caballero, Nathan Dew, Michael Lepore, Stephanie Pake, Charles Williamson, Brandon Fisher, Michael Gruenke, Joshua Hammons, David Navarro, Danielle Beller, and Jacob Benavides bring this action against Ford Motor Company, ("Defendant" or "Ford"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## **INTRODUCTION**

1.     The Plaintiffs and members of the classes they propose to represent purchased or leased 2018-2020 Ford F-150 pickup trucks equipped with 5.0L engines (hereinafter referred to collectively as the "F-150 Vehicles" or "Class Vehicles"). Ford designed, manufactured, marketed, and warranted the Class Vehicles.[1]

2.     Ford introduced the marketing campaign "Built Ford Tough" almost 40 years ago; it is an indelible part of the Ford brand.  Ford markets its F-150 trucks as "strong," "rugged," "durable," and "tough." Ford touts the F-150's "best-in-class towing," and states that the F-150 is a real "workhouse" that will prove itself "year after punishing year." Ford's marketing conveys the message that the F-150 is a durable, dependable vehicle suitable for activities like hauling and towing. Ford ads

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

depicting the F-150 almost invariably show these vehicles hauling, towing, or driving on challenging terrain.  For the Class Vehicles however, these marketing messages do not reflect reality.

3.      The Class Vehicles all suffer from a defect that renders these vehicles substantially less durable and dependable than Ford advertises. The Class Vehicles consume engine oil at an excessive rate, far beyond what a reasonable consumer would expect based on Ford's own representations – referred to below as the Oil Consumption Defect. As a result, the engine is not capable of maintaining the proper level of engine oil based on the care and maintenance instructions set forth in the Owner's Manual.  Instead, an owner must monitor the oil level more frequently than recommended in the Owner's Manual and add more oil to the engine than is typically required to keep the engine properly lubricated.

4.      Excessive oil consumption is a serious issue for vehicle longevity and safety. If the defect is not detected by the owner, continued operation of a vehicle with low levels of oil can cause premature wear on an engine, requiring the replacement of small parts, expensive vehicle system components, and even the entire engine – long before replacement would be needed under a normal maintenance schedule. Left unaddressed, low oil levels can also lead to unexpected engine stalling and even engine failure. Stalling and failure can occur while the Class

Vehicles are in operation, at any time, and under any driving condition or speed. This increases the risk of an accident and injury to everyone on the road.

5.    To avoid these negative outcomes, owners of the Class Vehicles must take on an unexpected burden: checking and filling their engine's oil much more frequently than a reasonable consumer would expect and more frequently than Ford represents in the Owner's Manual.

6.    Over-filling the oil pan or sump is not a solution.  If the oil pan is filled above its optimal level, marked by the maximum fill line, the crankshaft will be submerged partially or fully.  When operating in this condition, the crankshaft will cause aeration or foaming of the oil, which in turn reduces the efficacy of the lubrication system and thus lubrication of the engine.  Excess oil will also strain and then damage the gaskets and seals protecting the engine, leading to more significant oil leaks.

7.    Even when vehicle owners are successful in maintaining the proper oil level in their engines, problems remain because oil is leaking inside the engine.  The Oil Consumption Defect does not cause the Class Vehicles' engines to simply use more oil; it allows oil to migrate to places it should not be.  Excessive oil residue and the by-products of burning oil will then damage the combustion and exhaust systems and keep them from operating efficiently or even adequately over time.

3

8.    On information and belief, Plaintiffs allege that Ford has known about the excessive oil consumption of the Class Vehicles for years.  Ford has had access to the numerous complaints it has received, information from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal warranty and service records describing the excessive oil consumption problem.

9.    Notwithstanding all these sources of information, Ford has not disclosed to Plaintiffs and similarly situated consumers at, or before, point of sale that the Class Vehicles are predisposed to an excessively high rate of engine oil consumption.  Ford has yet to recall the Class Vehicles to repair the Oil Consumption Defect. Indeed, in many cases Ford has even refused to disclose the Oil Consumption Defect when a Class Vehicle displaying symptoms consistent with the defect is brought in for service.  Nor has Ford offered its customers a suitable repair or replacement or offered to reimburse its customers who have incurred out-of-pocket expenses or repair or mitigate the effects of the defect.

10.    When owners of the Class Vehicles have asked Ford to honor its warranty and address the Oil Consumption Defect and any resultant damage at no expense, Ford does not adequately repair the Class Vehicles. Instead, Ford either ignores the defect until it causes significant mechanical problems necessitating

costly repairs or, worse, provides oil servicing or makes mechanical adjustments that mask and even exacerbate, but do not fix, the Oil Consumption Defect.

11.     As a result of Ford's unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value. Ford committed these unfair and deceptive trade practices in a manner giving rise to substantial aggravating circumstances—including deceptive "repairs" and a continued practice of obfuscation and concealment.

12.     Had Plaintiffs and the Class members known about the Oil Consumption Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them.

13.     As a result of the Oil Consumption Defect and the monetary costs associated with attempting to repair such a defect and purchasing additional engine oil, Plaintiffs and the Class members have suffered injury in fact, incurred damages, and have otherwise been harmed by Ford's conduct.

14.     As a direct result of Ford's wrongful conduct, Plaintiffs and members of the Classes have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, out-of-pocket costs, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

5

15.    Accordingly, Plaintiffs bring this action to redress Ford's violations of state consumer protection and Ford's fraudulent concealment.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because the majority of Plaintiffs and Ford are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

17.    This Court has personal jurisdiction over Ford pursuant to 18 U.S.C. § 1965(b) & (d). This Court has personal jurisdiction over Ford because it has its principal place of business here, minimum contacts with the United States, this judicial district, and this State, and it intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Ford vehicles in this State and District.

18.    Venue properly lies in this District and vicinage pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Ford maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because Ford conducts a substantial amount of

business in this District. Accordingly, Ford has sufficient contacts with this District to subject Ford to personal jurisdiction in this District and venue is proper.

## PARTIES

### Plaintiffs

### I.     DANIEL BRYAN (KS)

19.     Plaintiff Daniel Bryan is a citizen and resident of the State of Kansas who resides in Leavenworth County.

20.     Plaintiff Bryan owns a 2019 Ford F-150 for personal, family, and/or household use that he purchased used from Premier Auto Outlet, a used car dealership owned at the time by an authorized Ford dealership called Victory Ford, in Kansas City, Kansas on or about May 19, 2023, with approximately 65,696 miles on the odometer.

21.     Passenger safety was an important factor in Plaintiff Bryan's decision to purchase his vehicle. Prior to purchasing his Class Vehicle, Plaintiff spoke with Ford sales representatives concerning the vehicle's features. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

22.    Plaintiff did not know and was never informed by Ford prior to purchasing his Class Vehicle that it had an Oil Consumption Defect.

23.    Shortly after purchasing his vehicle, Mr. Bryan noticed that the oil level was low and was forced to add oil to his vehicle more frequently than he would have expected.

24.    On or about October 2023, with approximately 68,000 miles on the odometer, Mr. Bryan brought his vehicle to his personal mechanic for excessive oil consumption because he had been forced to routinely add oil to his vehicle to prevent it from getting too low. His mechanic noted that he had heard about a design flaw in Ford F-150 vehicles that led to excessive oil consumption.

25.    On or about March 15, 2024, with approximately 74,640 miles on the odometer, Mr. Bryan brought his vehicle to Zeck Ford, an authorized Ford dealership in Levenworth, KS for excessive oil consumption. The representative recommended performing TSB 19-2365 but Mr. Bryan's warranty company told him that it would not be covered if he did not take his vehicle to Victory Ford, where he had bought the vehicle.

26.    Accordingly, on or about March 22, 2024, with approximately 74,877 miles on the odometer, Mr. Bryan brought his vehicle to Victory Ford, an authorized Ford dealership in Kansas City, Kansas, that he was required to utilize for any repairs as part of his warranty, for excessive oil consumption. His representative performed

TSB 19-2365, but it was still not covered by his warranty, and he was required to pay $131.20 for it out of pocket. The representative recommended he bring the vehicle back in every 3,000 miles to verify the oil level and add more if it gets low.

27.     Because of the cost and time associated with taking his vehicle to Victory Ford, Mr. Bryan has been adding oil himself since March 2024. He has been required to add more than a quart of oil every time he checks, usually after driving between 2500 and 3000 miles.

28.     As Ford has been unable to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

29.     Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

30.     When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

31.     At all times relevant herein, Plaintiff operated and used his 2019 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

32.     Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law, and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

33.     Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

**II.     VICTOR CABALLERO (LA)**

34.     Plaintiff Victor Caballero is a citizen and resident of the State of Alabama who resides in Madison County.

35.     Plaintiff Caballero owns a 2020 Ford F-150 that he purchased new from All Star Ford of Denham Springs, an authorized Ford dealership, in Denham Springs, Louisiana, on or about November 2020.

36.     Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in

owner's manuals, in correspondence sent to Plaintiffs and Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle was affected by the Oil Consumption Defect.

37.    Plaintiff did not know and was never informed by Ford before purchasing his Class Vehicle that it had an Oil Consumption Defect.

38.    On or about July 10, 2021, with approximately 21,428 miles on the odometer, Mr. Caballero brought his vehicle to Express Oil for routine service. The representative alerted him that his vehicle's engine oil level was critically low, with no oil on the dipstick. He did not realize at the time that this was due to his vehicle's excessive oil consumption.

39.    On or about July 2024, with approximately 61,000 miles on the odometer, Mr. Caballero brought his vehicle to Firestone for an oil change. A representative alerted him that there was no oil in his vehicle, noted that this was a common issue with his vehicle, and mentioned there was a TSB for this problem.

40.    On or about August 2024, with approximately 62,000 miles, Mr. Caballero brought his vehicle to Lynn Layton Ford, an authorized Ford dealership in Decatur, Alabama, for excessive oil consumption and to discuss the TSB that the Firestone representative had mentioned. The representative at the dealer acknowledged the TSB and replaced his dipstick.

41.     As Ford has been unable to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

42.     Furthermore, Plaintiff is expecting to pay $3,400 out of pocket toward an engine replacement.

43.     Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

44.     When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

45.     At all times relevant herein, Plaintiff operated and used his 2020 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

46.     Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and

omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

47.    Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

### III.    NATHAN DEW (MS)

48.    Plaintiff Nathan Dew is a citizen and resident of the State of Mississippi who resides in Jones County.

49.    Plaintiff Dew owns a 2018 Ford F-150 for personal, family, and/or household use that he purchased new from Woolwine Ford, an authorized Ford dealership, in Collins, Mississippi on or about October 8, 2018.

50.    Passenger safety was an important factor in Plaintiff Dew's decision to purchase his vehicle. Prior to purchasing his Class Vehicle, Plaintiff spoke with Ford sales representatives concerning the vehicle's features and dependability and viewed the vehicle's window sticker to determine what features the vehicle had. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by Ford dealerships, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

51.     Plaintiff did not know and was never informed by Ford prior to purchasing his Class Vehicle that it had an Oil Consumption Defect.

52.     On or about December 17, 2024, with approximately 67,688 miles on the odometer, Mr. Dew brought his vehicle to Woolwine Ford for excessive oil consumption. The dealership representative did not find any leaks but instructed Mr. Dew to return for an oil consumption test.

53.     On or about January 3, 2025, with approximately 68,000-69,000 miles on the odometer, Mr. Dew brought his vehicle back to Woolwine Ford for the excessive oil consumption test. The dealership representative told him the test would not be covered by his warranty and gave him a quote for an oil consumption test for $291.84. Mr. Dew declined the test because he did not understand why his warranty would not cover it.

54.     Despite the oil consumption concerns presented to the dealership, Plaintiff's vehicle continues to exhibit excessive oil consumption and requires an additional quart of oil every 1,000 miles.  As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

55.     Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it,

he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

56.    When Plaintiff purchased his Class Vehicle, he justifiably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

57.    At all times relevant herein, Plaintiff operated and used his 2018 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

58.    Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

59.    Ford never informed the Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## IV.    MICHAEL LEPORE (CT)

60.    Plaintiff Michael Lepore is a citizen and resident of the State of Rhode Island who resides in Providence County.

15

61.     Plaintiff Lepore owns a 2018 Ford F-150 for personal, family, and/or household use that he purchased new from Putnam Ford, an authorized Ford dealership now known as Heritage Valley Ford, in Putnam, Connecticut on or about August 4, 2018.

62.     Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials, including Ford's TV commercials, regarding the safety and reliability of the Class Vehicle. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

63.     Plaintiff did not know and was never informed by Ford prior to purchasing his Class Vehicle that it had an Oil Consumption Defect.

64.     On or about July 2023, with approximately 20,500 miles on the odometer, Plaintiff Lepore began noticing oil consumption problems in his vehicle.

66.     On or about August 22, 2023, with approximately 20,922 miles on the odometer, Mr. Lepore brought his vehicle to Heritage Valley Ford to address his vehicle's excessive oil consumption. He informed the dealership that his vehicle was excessively consuming oil and that the oil dip stick was not showing any oil. The dealership representative confirmed this was the case and performed TSB 19-2365

by replacing oil, the oil filter, and the dipstick, as well as reprogramming the PCM, to address the excessive oil consumption issue.

65.    On or about October 19, 2024, with approximately 24,102 miles on the odometer, Mr. Lepore brought his vehicle to Heritage Valley Ford to address his vehicle's ongoing excessive oil consumption issues. The dealership representative told him that no further action could be taken because Ford had instructed dealers that it was acceptable for Ford F-150s to use one quart of oil for every 1,000 miles driven.

66.    As Ford has been unable to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

67.    Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

68.    When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

17

69.    At all times relevant herein, Plaintiff operated and used his 2018 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

70.    Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

71.    Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## V.    STEPHANIE PAKE (MI)

72.    Plaintiff Stephanie Pake is a citizen and resident of the State of Michigan who resides in Lake County.

73.    Plaintiff Pake owns a 2019 Ford F-150 for personal, family, and/or household use that she purchased new from Fox Ford Cadillac, an authorized Ford dealership, in Cadillac, Michigan, on or about April 23, 2019.

74.    Prior to purchasing her Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including Ford's TV commercials. Ford had the opportunity to disclose the Oil Consumption Defect

18

through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

75. Plaintiff did not know and was never informed by Ford prior to purchasing her Class Vehicle that it had an Oil Consumption Defect.

76. On or about October 27, 2023, with approximately 85,000 miles on the odometer, Ms. Pake brought her vehicle to Fox Ford Cadillac for an oil change before driving to Florida in the beginning of November.

77. On or about December 15, 2023, with approximately 93,208 miles on the odometer, Ms. Pake brought her vehicle to Ford of Clermont, an authorized Ford dealership, in Clermont, Florida, after her truck would not start. She had to have her car towed to the dealership. The representative told her that her car had two fewer quarts of oil than it should have had.

78. On or about December 27, 2023, with approximately 93,417 miles on the odometer, Ms. Pake brought her vehicle back to Ford of Clermont after she heard a ticking sound in her engine. The representatives told her this was a normal characteristic of her vehicle.

79. Following that visit to Ford of Clermont, Ms. Pake's husband did some research and found out about the TSBs being performed on vehicles like hers. On or

about May 2024, Plaintiff returned to Fox Ford Cadillac to ask to have a TSB performed because of excessive oil consumption, but the representatives at the dealership ignored her request and told her that it was normal for her vehicle to burn a quart of oil every 1,500-2,000 miles.

80.     As Ford has been unable to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor her engine oil levels closely and add additional oil more frequently than expected.

81.     Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, she would not have purchased her Class Vehicle or otherwise would have paid significantly less for it.

82.     When Plaintiff purchased her Class Vehicle, she reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

83.     At all times relevant herein, Plaintiff operated and used her 2019 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

84.     Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of her Class Vehicle.

85.     Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## VI.     CHARLES WILLIAMSON (MO)

86.     Plaintiff Charles Williamson is a citizen and resident of the State of Missouri who resides in St. Charles County.

87.     Plaintiff Williamson owns a 2018 Ford F-150 for primarily personal, family, and/or household use that he purchased new from Paul Cerame Ford, an authorized Ford dealership, in Florissant, MO on or about January 17, 2019.

88.     Passenger safety was an important factor in Plaintiff Williamson's decision to purchase his vehicle. Prior to purchasing his Class Vehicle, Plaintiff spoke with Ford sales representatives concerning the vehicle's features. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through vehicle brochures and other informational documents, or on Ford's website.

21

However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

89.     Plaintiff did not know and was never informed by Ford prior to purchasing his Class Vehicle that it had an Oil Consumption Defect.

90.     When his Class Vehicle had approximately 50,000-60,000 miles on the odometer, Mr. Williamson noticed that his vehicle was experiencing excessive oil consumption issues.

91.     On or about October 1, 2021, with approximately 68,902 miles on the odometer, Mr. Williamson brought his vehicle to Bommarito Ford, an authorized Ford Dealer in Hazelwood, Missouri, because oil was leaking onto his driveway following his previous oil change. The representative at the dealership found that a drain plug was worn out and seeping oil, and replaced the drain plug and redid the oil change. When Mr. Williamson asked for a further explanation about the oil consumption problems, the representative told him that Ford was telling dealerships that this engine needed one quart of oil per 1,000 miles driven.

92.     As Ford has been unable to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption, which can result in his vehicle shutting down. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

93.     Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

94.     When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

95.     At all times relevant herein, Plaintiff operated and used his 2018 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

96.     Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

97.     Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## VII.   BRANDON FISHER (MS)

98.     Plaintiff Brandon M. Fisher is a citizen and resident of the State of Mississippi who resides in Jackson County.

99.     Plaintiff Fisher owns a 2020 Ford F-150 for personal, family, and/or household use that he purchased new from Estabrook Ford-Lincoln (Estabrook Motor Co., Inc.), now Cannon Ford of Pascagoula, an authorized Ford dealership, in Pascagoula, Mississippi on or about December 23, 2020, with approximately 24 miles on the odometer.

100.    Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including Ford's TV commercials, and researched the vehicle's features on different forums. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

101.    Plaintiff did not know and was never informed by Ford prior to purchasing his Class Vehicle that it had an Oil Consumption Defect.

102.    At some point in 2021, Plaintiff checked his oil and noticed it was low after speaking with a colleague who had the same vehicle as him and discussed his

own oil consumption issues with Plaintiff. Mr. Fisher brought his vehicle back to Cannon Ford of Pascagoula for excessive oil consumption. The dealership inspected his vehicle and performed a TSB, but the representative did not inform him there was any oil consumption issue or offer any explanation for the low oil.

103.   At some point in 2022 and again in 2023, Mr. Fisher brought his vehicle back to Cannon Ford of Pascagoula for excessive oil consumption after noticing his oil was low. On both occasions, the dealership inspected his vehicle and performed a TSB, but the representative did not inform him there was any oil consumption issue or offer any explanation for the low oil.

104.   On or about January 19, 2024, with approximately 49,383 miles on the odometer, Mr. Fisher brought his vehicle back to Cannon Ford of Pascagoula for excessive oil consumption after he noticed his oil was low. The dealership performed an oil change, and then charged him approximately $98 for doing so, but did not offer any explanation for why his oil was low.

105.   On or about February 23, 2024, with approximately 52,031 miles on the odometer, Mr. Fisher brought his vehicle back to Cannon Ford of Pascagoula for excessive oil consumption. After inspecting his vehicle, the dealership representative mentioned that he wanted to perform a new oil consumption analysis on the vehicle, without acknowledging any issue, and Mr. Fisher declined because

25

the previous analyses the dealership performed on his vehicle took a long time and did not fix anything.

106.   On or about July 26, 2024, with approximately 58,701 miles on the odometer, Mr. Fisher brought his vehicle back to Cannon Ford of Pascagoula for excessive oil consumption. The dealership inspected his vehicle, changed the engine oil and replaced the oil filter, and then charged him approximately $101.28 for doing so, without offering any explanation for the excessive oil consumption.

107.   On or about January 27, 2025, with approximately 68,136 miles on the odometer, Mr. Fisher brought his vehicle back to Cannon Ford of Pascagoula for excessive oil consumption. The dealership inspected his vehicle and performed an oil consumption analysis and oil and filter service with tire rotation. The dealership did not offer any explanation for the oil consumption, instead only recommending Plaintiff bring in his vehicle at 1,000-mile intervals for monitoring. He was charged approximately $101.28.

108.   As Ford has not been able to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

109.   Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it,

he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

110.   When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

111.   At all times relevant herein, Plaintiff operated and used his 2020 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

112.   Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

113.   Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## VIII.  MICHAEL GRUENKE (CA)

114.   Plaintiff Michael Gruenke is a citizen and resident of the State of California who resides in Santa Cruz County.

115. Plaintiff Gruenke owns a 2018 Ford F-150 for personal, family, and/or household use that he purchased used from Ford of Upland, an authorized Ford dealership located in Upland, California on January 13, 2023. Plaintiff Gruenke purchased an extended warranty from Ford in conjunction with his purchase of the vehicle, for the earlier of 60,000 miles or May 27, 2025.

116. Prior to purchasing his Class Vehicle, Plaintiff Gruenke spoke with Ford sales representatives concerning the vehicle's features and test drove the Class Vehicle. None of these sources disclosed the Defect.

117. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in Owner's Manuals, in correspondence sent to Plaintiffs and Class members, through representations by Ford dealerships, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

118. In November 2023, when his vehicle had approximately 43,403 miles on the odometer, Plaintiff Gruenke observed that the oil level in his vehicle was low. He brought his vehicle to Watsonville Ford, an authorized Ford dealership located in Watsonville, California. Watsonville Ford performed an oil change and oil consumption test. Watsonville Ford instructed Plaintiff Gruenke to return after he had driven approximately 1,000 miles to check the oil level.

28

119.   In January 2024, when his vehicle had approximately 44,478 miles on the odometer, Plaintiff Gruenke brought his vehicle back to Watsonville Ford to check the oil level. According to the service record, the vehicle passed the consumption test. Watsonville Ford performed the Technical Service Bulletin 19-2365. However, the repair did not resolve the engine noise issue, as it continued to persist.

120.   In March 2024, when his vehicle had approximately 48,485 miles on the odometer, Plaintiff Gruenke brought his vehicle to Watsonville Ford to report continued oil consumption problems. Watsonville Ford confirmed the issue and determined that a new motor was needed.

121.   Plaintiff Gruenke's vehicle continues to exhibit oil consumption at an excessive rate. As a result, Plaintiff Gruenke continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

122.   Had Plaintiff Gruenke known or otherwise been made aware of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

123.   When Plaintiff Gruenke purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with

an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eliminate any such defects.

124.   At all times relevant herein, Plaintiff Gruenke operated and used his 2018 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used, but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

125.   Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law, and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

126.   Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## IX.   DAVID NAVARRO (MI)

127.   Plaintiff David Navarro is a citizen and resident of the State of Michigan who resides in Genesee County.

128.   Plaintiff Navarro owns a 2020 Ford F-150 for personal, family, and/or household use that he initially leased new from Lasco Ford, on or about September 2020. The truck was purchased on September 18, 2023.

129.   Prior to leasing and purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including Ford's TV commercials, and researched the vehicle's features on different forums. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

130.   Plaintiff did not know and was never informed by Ford prior to leasing or purchasing her Class Vehicle that it had an Oil Consumption Defect.

131.   In late 2024, with approximately 75,000 miles, Plaintiff noticed the vehicle was using/requiring considerably more oil, the engine was rattling and was stalling. Mr. Navarro brought her vehicle to Randy Wise Ford in Ortonville, Michigan and was told by the service advisor that they would have to break down the engine to determine the cause of the oil consumption, rattling and stalling, which would cost the Plaintiff approximately $7,000.

132.   The Plaintiff towed the vehicle to Lasco Ford. The vehicle remained at Lasco Ford for over three (3) months and eventually replaced the engine.

133.   As Ford has not been able to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption. As a result,

Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

134.   Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, she would not have purchased her Class Vehicle or otherwise would have paid significantly less for it.

135.   When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

136.   At all times relevant herein, Plaintiff operated and used his 2020 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

137.   Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law, and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

138.   Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk before the purchase of his Class Vehicle.

## X.   JACOB BENAVIDES (FL)

139.   Plaintiff Jacob Benavides is a citizen and resident of the State of Florida who resides in Polk County.

140.   Plaintiff Benavides owns a 2018 Ford F-150 for personal, family, and/or household use that he purchased new from Bartow Ford, an authorized Ford dealership, in Bartow, Florida, on or about April 23, 2020.

141.   Passenger safety was an important factor in Plaintiff Benavides' decision to purchase his vehicle. Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and putative Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

142.   Plaintiff did not know and was never informed by Ford prior to purchasing his Class Vehicle that it had an Oil Consumption Defect.

143.   On or about May 30, 2023, with approximately 46,506 miles on the odometer, Mr. Benavides brought his vehicle to Bartow Ford due to engine

stalling/lagging, knocking sounds, and excess oil consumption. Benavides had associated out-of-pocket expenses.

144.   On or about June 6, 2025, Plaintiff Benavides brought his vehicle to the dealership with approximately 65,570 miles on the odometer to address the continued problems. He received an engine replacement; however, he incurred some expenses associated with the warranty deductible. Benavides was responsible for the deductible costs.

145.   Ford has been unable to cure the Oil Consumption Defect. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

146.   Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

147.   When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

148.   At all times relevant herein, Plaintiff operated and used his 2018 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but

can no longer do so given the recurring problems caused by the Oil Consumption Defect.

149.   Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

150.   Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## XI.   DANIELLE BELLER (FL)

151.   Plaintiff Danielle Beller is a citizen and resident of the State of Florida who resides in Palm Beach County.

152.   Plaintiff Beller owns a 2019 Ford F-150 for personal, family, and/or household use that she purchased used from Mullinax Ford of Palm Beach, an authorized Ford dealership, in West Palm Beach, Florida on or about November 23, 2019. The vehicle had approximately 15,000 miles.

153.   Passenger safety was an important factor in Plaintiff Beller's decision to purchase her vehicle. Prior to purchasing her Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including commercials, website, prior ownership, and other online research. Ford

had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and putative Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

154.   Plaintiff did not know and was never informed by Ford prior to purchasing her Class Vehicle that it had an Oil Consumption Defect.

155.   On or about November 20, 2023, with approximately 59,356 miles on the odometer, Ms. Beller brought her vehicle to Mullinax Ford of Palm Beach due to excess oil consumption, the engine warning light and other warning lights were on, and engine rattling.

156.   The engine rattling and warning lights were confirmed. Further, there was no oil on the dipstick and TSB 19-2365 was performed replacing the dipstick and PCM reprogram.

157.   As Ford has been unable to cure the Oil Consumption Defect, Plaintiff's vehicle continues to exhibit excessive oil consumption. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor her engine oil levels closely and add additional oil more frequently than expected.

158.   Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it,

she would not have purchased her Class Vehicle or otherwise would have paid significantly less for it.

159.   When Plaintiff purchased her Class Vehicle, she reasonably relied on the reasonable expectation that her Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

160.   At all times relevant herein, Plaintiff operated and used her 2019 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

161.   Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

162.   Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

## XII.   JOSHUA HAMMONS (KY)

163.   Plaintiff Joshua Hammons is a citizen and resident of the State of Kentucky who resides in Laurel County.

164.   Plaintiff Hammons owns a 2020 Ford F-150 for personal, family, and/or household use that he purchased used from Don Franklin Lexington Hyundai, which is owned by Don Lexington Auto Mall, an authorized Ford dealership, on July 17, 2021, with approximately 10,292 miles on the odometer.

165.   Passenger safety was an important factor in Plaintiff Hammons' decision to purchase his vehicle. Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including Ford's website and Ford television commercials. He also test drove the vehicle. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and putative Class members, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

166.   Plaintiff did not know and was never informed by Ford prior to purchasing his Class Vehicle that it had an Oil Consumption Defect.

167.   Since the time he purchased his vehicle, Plaintiff Hammons unknowingly experienced excess oil consumption. He would hear knocking from the engine that would go away every time he received an oil change at every 3,000-5,000 miles. However, during those oil changes, it was not disclosed to him that his oil was almost entirely depleted.

168.   In 2024, he presented his vehicle to Legacy Ford in Corbin, Kentucky, where they identified the oil consumption problem. In an attempt to remedy the Defect, Corbin Ford replaced the engine in Plaintiff Hammons' vehicle.

169.   However, the replacement engine is also experiencing the Oil Consumption Defect. Plaintiff Hammons continues to drive his vehicle, which necessitates an oil change every 3,000-5,000 miles. To this day, the Oil Consumption Defect has not been remedied in Plaintiff Hammons' vehicle.

170.   Ford has been unable to cure the Oil Consumption Defect. As a result, Plaintiff continues to absorb the expense and inconvenience of having to monitor his engine oil levels closely and add additional oil more frequently than expected.

171.   Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

172.   When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or that Ford could, and would, properly repair and eradicate any such defects.

173.   At all times relevant herein, Plaintiff operated and used his Class Vehicle in a reasonably foreseeable manner and as the vehicle was intended to be

used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

174.  Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

175.  Ford never informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

**<u>Defendant</u>**

176.  Ford is a corporation formed under Delaware law with its principal place of business located at One American Drive, Dearborn, Michigan 48126. Ford designs, tests, manufactures, distributes, warrants, sells, and leases various vehicles under several prominent brand names, including Ford and Lincoln in this District and throughout the United States. At all times relevant to this action, Ford manufactured, distributed, marketed, sold, leased, and warranted the Class Vehicles throughout the United States. Ford manufactured the Class Vehicles knowing about the Oil Consumption Defect, without either disclosing it at the time of sale or attempting to remedy it. Ford also developed and disseminated the Owner's

Manuals, warranty booklets, advertisements, and other promotional materials relating to the Ford F-150.

## FACTUAL ALLEGATIONS

### A.    Ford's Marketing of the F-150

177.   Ford designs, engineers, manufactures and sells vehicles throughout the United States.

178.   Ford's F-Series truck has been the best-selling vehicle in the United States for 37 years. The F-Series maintains a dominant market share, representing nearly one-third of all pickup trucks sold in the United States. Over the past three years, Ford has sold an average of 900,000 F-150s per year.[2] Worldwide, an F-Series truck is sold every 29.3 seconds.

179.   The F-Series has been immensely profitable for Ford. As of 2018, approximately $50 billion dollars of Ford's annual $160 billion in sales come from the sale of the F-Series truck alone. To put this in context, reporting indicates that if the Ford F-Series was its own Fortune 500 company, it would exceed the annual revenue of companies like Oracle, American Express, and Best Buy.

---

[2] Exhibit A, Jake Lingeman, *Ford Averages over 100 F-150 Pickups Sold per Hour, 24/7*, Autoweek (June 23, 2020), https://www.autoweek.com/news/trucks/a32945300/ford-averages-over-100-f-150-pickups-sold-per-hour-247/ (last visited December 18, 2024).

180.   In 2018, Ford debuted new and enhanced engines for the F-150 line. Ford advertised them as "reengineered, upgraded, improved . . . the most advanced F-150 engine lineup ever."   The "enhanced" 5.0L engine was highlighted as "Horsepower and torque – increased. Fuel efficiency – improved. The trusted 5.0L V8 engine – better than ever.  A new dual-injection system increases compression ratio to 12:1. Upgraded main and connecting rod bearings provide greater durability."

181.   The 2018 F-150 product brochure emphasized durability, reliability, efficiency, and safety, promising:

- "A segment-exclusive combination of advanced materials that are durable and inhibit corrosion help the 2018 Ford F-180 deliver mightily on its Built Ford Tough promise."

- "Optimize[d] fuel usage during city driving with Auto Start-Stop Technology, standard on F-150. It can shut off the engine when the truck comes to a complete stop, the restart it automatically when the brake is released. . . . An integrated electric pump works with Auto Start-Stop Technology to keep the  transmission staged for seamless restarts and improved driving efficiency."

- A full page of safety features including a lane-keeping system, electric power-assisted steering, roll stability control, cross traffic alerts, pre-collision assist with pedestrian detection, curve control, a blind spot information system, and trailer sway control.

182.   In the 2019 F-150 brochure, Ford's marketing emphasized the tagline "Built Ford Tough," explaining the phrase as follows: "It's more than just a brutal testing regimen. Built Ford Tough is a battle cry. One filled with honor, courage,

and determination to never rest – until the job's done right. With well over 10 million customer-equivalent miles of testing, the F-150 earned its [Ford nameplate]. Being tortured in the lab. On the proving grounds. And working in the real world.  Have no doubt, this truck is engineered for the long haul. Having repeatedly passed our toughest tests, it's more than ready for yours."

183.   The 2020 brochure, like those of 2018 and 2019, emphasized the vehicles' durability, reliability, efficiency, and safety with pages devotes to the strength of the materials and construction of the truck, fuel efficiency improvements, and more than ten highlighted safety features.  Ford added to its 2019 Built Ford Tough battle cry with a new promise: Built To Get It Done.  According to Ford, "This workhorse takes your 'to dos' and gets them 'done.' Time after time after time. Hauling cinder block to another section of the job site. Done. Loading the bed with mulch at the landscape supply company. Done. Towing your 32' boat to the lake for an extended holiday weekend. Oh so done."

184.   Ford advertises that its rigorous evaluation of its vehicles continues after pre-market testing. According to Ford's website, "[the company] use[s] warranty repairs per thousand vehicles at three months in service as a key metric for

measuring initial quality. Initial quality goes beyond warrantable defects, to include measures of customer excitement with new product features."[3]

185.   Ford also makes many public representations about the safety of its vehicles and the company's commitment to developing advancing technologies to promote safety.   For instance, Ford touts that "we continue to develop new, innovative technologies that enhance vehicle safety and help customers feel safe and confident on the road."[4]

186.   Ford also advertises the connection between the quality and safety of its vehicles: "Quality is critical to the safety of our customers and, therefore, to our responsibilities and success as a company. Safety continues to be one of the highest priorities in the design of our vehicles. We are committed to designing and manufacturing vehicles that achieve high levels of safety over a wide range of real-world conditions."[5]

187.   In order to achieve Ford's safety goals, it further advertises that it "is continuously working to enhance the safety of our products, a fundamental aspect of

---

[3]   Exhibit   B,   *Putting   People   First*,   Ford   Motor   Company, https://corporate.ford.com/microsites/sustainability-report-2020/putting-people-first.html (last visited March 25, 2024).

[4]   *Id.*

[5]   Exhibit   C,   *Improving   Vehicle   Safety*,   Ford   Motor   Company (2017)https://www.responsibilityreports.com/HostedData/ResponsibilityReportArchive/f/NYSE_F_2017.pdf (last visited December 18, 2024).

our Quality Operating System (QOS)."[6] In order to achieve this, Ford states that it "conduct[s] engineering analyses, computer simulations and crash testing to evaluate the performance of vehicles and components at a number of sites around the world."[7]

188.  Finally, Ford states that "[i]n addition to meeting or exceeding regulatory requirements, our processes, tools and facilities confirm that our vehicles align with our own stringent internal guidelines on safety design, as well as Ford-specified levels of performance for Public Domain tests. We regularly re-evaluate and update these guidelines as appropriate."8

### B.    Oil Consumption in the Class Vehicles

189.  The 5.0 liter engine in the Class Vehicles is manufactured by Ford at its Essex Engine Plant in Windsor, Ontario. The 5.0L engine, named the "Coyote" by Ford, is a modular V-8 piston engine with Port Fuel Injection ("PFI") and Direct Fuel Injection ("GDI" or "DI"), four-valve per cylinder, dual overhead cylinder heads cast, forged steel crankshaft and a high 12.0:1.0 compression ratio.

190.  The Class Vehicles were put to market with a feature known as Deceleration Fuel Shut Off ("DFSO"). This feature will shut off fuel delivery when the engine is decelerating in an attempt to reduce fuel consumption and increase

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

overall MPG. When the driver accelerates, the fuel automatically begins flowing again and the vehicle accelerates as the driver commands.

191.   According to Ford's Owner's Manual, the 5.0L Coyote engines in the Class Vehicles have an engine oil capacity of 8.8 quarts, including the oil within the oil filter.[9]  The Owner's Manual warns owners to not over-fill the engine oil: "Do not add oil further than the maximum mark. Oil levels above the maximum mark may cause engine damage."

192.   According to Ford's Owner's Manual, each Class Vehicle contains an Intelligent Oil-Life Monitor that determines when the owner should change the engine oil based on how the vehicle is used.[10] The oil change indicator may illuminate as early as 3,000 miles since a prior oil change but under no circumstances does Ford recommend oil change intervals exceed 10,000 miles or one year between intervals.[11] If the monitor fails, Ford recommends changing the oil every 5,000 miles.

---

[9]                                  *See,*                                *e.g.*,
https://media.ford.com/content/dam/fordmedia/North%20America/US/product/2020/f150/2020-F150-TechSpecs.pdf (last visited December 18, 2024) (Exhibit D).
[10]https://www.fordservicecontent.com/Ford_Content/vdirsnet/OwnerManual/Home/Content?variantid=7026&languageCode=en&countryCode=USA&Uid=G2042723&ProcUid=G2042724&userMarket=USA&div=f&vFilteringEnabled=False   (last visited December 18, 2024) (Exhibit E).
[11] *Id.*

193.    The Ford Owner's Manual encourages owners to check their oil levels monthly.  Given that the average motorist in the United States drives approximately 13,000 miles per year, Ford knows, or should know, that a monthly check, on average, will happen at intervals of approximately 1,080 miles and possibly much greater.  While encouraging owners to check their oil on a periodic basis between oil changes, Ford does not instruct them to add oil to their engines regularly; instead, the Owner's Manual advises that oil should only be added between oil changes if the oil level is at (or presumably below) the *minimum* fill line on the dipstick.

194.    As described in more detail below, Ford has recognized that oil consumption exceeding 1 quart per 3,000 miles traveled in Ford F-150 trucks is excessive and should be investigated and repaired.

195.    The 5.0L Coyote engines installed in the Class Vehicles use eight reciprocating pistons to convert the pressure created by the combustion of gasoline mixed with air into a rotating motion. Gasoline, and only gasoline as a fuel, is mixed with air in the combustion chamber of the engine. To generate such rotating motion, a four-step sequence (the "Combustion Cycle") is used. First, the intake stroke begins with the inlet valve opening and an atomized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the air in the combustion chamber. Third, the power stroke begins when the spark plug ignites the

47

fuel/air mixture, expanding the gases and generating power that is transmitted to the crankshaft. Fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving up, pushing the exhaust gases out of the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself. A diagram of the Combustion Cycle is below:



196.   During this process, engine oil is used to lubricate the piston, piston rings, and the cylinder wall as the piston moves up and down. Engine oil reduces wear on moving parts throughout the engine, improves sealing, and cools the engine by carrying heat away from the moving parts. If there is an insufficient amount of engine oil, the engine will not have the necessary lubrication or cooling, thereby

causing premature wear of internal parts, inadequate performance, and even catastrophic engine failure.

197.   The top sidewall of each engine piston contains flexible metal rings that when correctly sized, installed, and properly tensioned, prevent engine oil from entering the combustion chamber, as well as optimizing compression. On each piston, there are three rings: the top compression ring, the second compression ring, and the oil control ring.



Each ring plays a role in preventing oil from entering the combustion chamber of the engine.

198.   The top ring is a compression ring, which means it is responsible, in part, for separating the combustion chamber from the engine oil sump.  It is also responsible for forming a seal between the piston (the movable part of the

combustion chamber) and the remaining fixed combustion chamber geometry such that the intake gases can be compressed.  It is the closest ring to the inlet valve which controls the flow of the combustion gases.  As such, the top compression ring is exposed to a significant amount of chemical corrosion and very high operating temperatures.  The top compression ring transfers approximately 70% of the combustion chamber heat from the piston to the cylinder wall.

199.   The second piston ring is also a compression ring and is used to augment and complete the seal of the combustion chamber.  It also acts as the final seal to wipe the cylinder wall clean of any remaining engine oil. Combustion gases that pass by the top compression ring are stopped by the second compression ring.

200.   The bottom ring, the oil control ring, is actually two rings in one piston groove.  Its function is to control the amount of engine oil present on the surface of the cylinder bore and to wipe excess oil from the cylinder wall during piston movement.  The return of excess oil through the opening between the two rings, through the oil drain holes, is directed to the engine oil pan (sump). The oil control ring includes two thin rails or running surfaces.

201.   The pistons move up and down within the cylinders of the engine block in sliding contact.  In this particular class of engines, the surface of the cylinder walls is coated with a plasma intended to maximize efficient operation, defined as minimizing sliding friction and increasing combustion chamber efficiency.

202.   If engine oil is able to get past any of these piston rings, the engine oil will enter the combustion chamber.  Once engine oil is in the combustion chamber, it will contribute as fuel to the Combustion Cycle sequence.  However, even though the engine oil is a hydrocarbon (fuel), it combusts significantly slower than gasoline. Thereby, excess oil in the combustion chamber decreases combustion efficiency (the power produced), increases emissions, poisons the catalytic converter, and finally causes the reduction of the overall amount of oil contained in the engine.

203.   Upon information and belief, the piston ring assembly and cylinder coating in the Class Vehicles are defective.  Rather than preventing oil from by-passing the rings and entering the combustion chamber, they permit engine oil to seep into the combustion chamber of the engine. As a result, engine oil is not adequately separated from the Combustion Cycle. Instead, engine oil is burned and consumed during the Combustion Cycle. Additionally, and as a result, the crankcase becomes pressurized since gases from the Combustion Cycle are allowed to enter the crankcase.

204.   Throughout the combustion process, engine oil is pumped from the crankcase, circulated throughout the engine, filtered and then returned to the crankcase to begin the cycle again. To reduce the risk of crankcase contamination and improve vehicle emissions, the positive crankshaft ventilation ("PCV") system was invented in the early 1960s. The PCV system involves the recycling of these

51

unwanted vapors through a valve (the "PCV valve") and circulates them back into the intake manifold, where they are pumped back into the engine sump to be re-entrained into the engine oil.

205.   In the Class Vehicles, the PCV system is inadequate and fails to reduce pressure within the crankcase caused by combustion gases escaping from the combustion chamber, past the piston and oil rings, and into the crankcase. This is because the increased blow-by as a result of the reduced piston and oil control ring tensions in an effort to decrease overall friction within the engine in the hopes of gaining greater MPG. As a result, this has a direct negative impact on the vehicles' durability, life expectancy, performance, emissions, and safety.

206.   If the loss of oil is not detected and the engine oil is not refilled to the minimum level, the engine will be marginally lubricated or under-lubricated. Inadequate lubrication will cause premature, substantial wear and then substantial damage throughout the engine necessitating expensive repairs. Lack of oil can culminate in engine failure, which is a serious safety risk.  If the loss of oil is detected and the engine oil is over-filled, similar damage results.  Even if the loss of oil is detected and the owner is able to maintain proper oil levels, the escaping oil burns off in the combustion and exhaust systems, causing damage to key emission-related components in the exhaust system.

C.   **The Oil Consumption Defect Damages Engine Parts and Vehicle Systems, Impairs Efficiency, and Causes Higher Emissions.**

207.   As discussed above, on information and belief, the engine oil control system in the Class Vehicles does not work as intended, allowing oil to pass into the combustion chamber during the combustion process. Once in the combustion chamber, the by-passing oil is burned off rather than returned for further lubrication. This not only causes a decrease in engine performance, but also decreases fuel efficiency, causes carbon deposits to form, and will damage the engine and various ignition and emission components.

208.   Engine oil is a hydrocarbon; when it is present in the combustion chamber during the combustion cycle, it ignites and burns as any other hydrocarbon. However, due to the chemical nature of oil – which is more viscous and denser than gasoline -- it burns slower and generates heat over a longer period of time.  Because of these characteristics, engine oil contributes practically nothing to the combustion part of the cycle, and only generates heat in the exhaust system due to the longer burn (combustion) times.  It does, however, consume some of the oxygen in the combustion chamber, thereby reducing both ignition and combustion efficiency. This in turn increases emissions, which causes the fuel management system to introduce a different and most often non-optimal fuel-to-air ratio during the next cycle.

209. Optimum combustion depends on the correct fuel/air ratio in order to provide a near stoichiometric mixture (*i.e.*, the fuel amount is neither excessive nor lacking).[12] The oxygen sensors monitor unburned oxygen in the exhaust gases and send this information to the engine control module, which then uses this information to determine if the fuel mixture is rich (too much fuel) or lean (not enough fuel) and adjusts the fuel/air mixture as necessary. The oxygen sensors also measure oxygen levels after the exhaust reacts with the catalytic converter, to help the engine run efficiently and to minimize emissions. The catalytic converters are emission control devices designed to convert toxic pollutants, contained in exhaust gases, to less toxic pollutants by catalyzing a redox reaction (oxidation or reduction).

210. While a significant amount of the unwanted engine oil is burned within the combustion chamber during the Combustion Process, any remaining and as-yet unburned oil exits the combustion chamber *via* the exhaust valve and is passed on to the catalytic converter. Excess oil entering into the exhaust system can cause damage to that system and increases harmful emissions.

211. The Oil Consumption Defect can contaminate oxygen sensors and catalytic converters of the Class Vehicles. Contamination can impair the accuracy of the oxygen sensors, for example, hampering the catalytic converters and causing

---

[12] The stoichiometric mixture for a gasoline engine is the ideal ratio of air to fuel that burns all fuel with no excess air. For gasoline fuel, stoichiometric air/fuel mixture is about 14.7:1 -- *i.e.*, for every one gram of fuel, 14.7 grams of air are required.

the engine to not properly detect emission issues. Likewise, the catalytic converters can become poisoned as an effect of engine oil burning during the combustion cycle. The burnt oil is incorporated into the expelled exhaust gases of the engine, with the exhaust containing substances that coat the working surfaces of the catalytic converters, encapsulating the catalyst materials so that they cannot contact and treat the exhaust.

212.   The catalytic converter is the central component of the emission system of any vehicle equipped with an internal combustion engine.  Since 1975, almost all cars and light-duty trucks have come equipped with catalytic converters to comply with Clean Air Act standards on harmful emissions.  The catalytic converter converts dangerous compounds produced in the combustion process into less harmful compounds.

213.   A catalytic converter is designed to last the entire useful life of a vehicle.   The catalytic converter converts harmful chemical compounds like carbon monoxide and nitrogen oxide into more inert compounds prior to being returned to the atmosphere.  The exhaust system does this by using the pressurized gases from the exhaust stroke of the engine to push these exhaust gases through honeycomb structures made of heat resistant ceramic, coated with the catalytic materials and contained within a stainless-steel case.   Each of the channels within the honeycomb structure are lined with precious metals such as platinum, rhodium, and palladium

that act as catalysts to the conversion process. When dangerous compounds like carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (NOx) molecules come into contact with the platinum, rhodium, and palladium, the molecules are either reduced catalytically or oxidized into recumbent gases that are less harmful – typically carbon dioxide (CO2) and nitrogen (N2) -- and water (H2O).

192.   If excess oil enters into the catalytic converter, the conversion process is disrupted and reduced in efficiency and efficacy. Excess oil will coat the working surfaces of platinum, rhodium, and palladium and mask the catalysts, preventing them from reacting with the toxic exhaust gases. This is called "catalyst poisoning" and causes the vehicle to make changes (sometimes drastic changes) to the fuel/air ratio through the fuel management system and to release higher levels of harmful emissions.

214.   Excess oil in the exhaust system can cause other problems that lead to higher emissions. On both sides of the catalytic converter, O2 sensors monitor the concentration of oxygen in exhaust gases. The O2 sensors transmit that data to the Engine Control Unit ("ECU").

215.   Another effect is that phosphorus is released when the excess oil is burned and will foul (*i.e.*, plate on to) the O2 sensor, causing the O2 sensor to degrade or fail. When the O2 sensor is fouled, it will incorrectly communicate to the ECU, which will then make incorrect adjustments to the fuel/air ratio being provided

to the engine.  The ECU may adjust the fuel/air ratio and make it too lean - meaning that there is too little fuel and too much air in the mixture.  A lean mixture, if not corrected will cause the exhaust/emission systems to allow excess amounts of NOx to pass to the environment.

216.   The ECU may also respond by adding fuel to the fuel/air mixture creating a "rich" fuel mixture ("rich" because there is too much gasoline and too little air). When engines run using a "rich" fuel mixture, fuel economy is reduced because the engine is receiving more fuel than it can consume during the combustion process.  This excess fuel then continues through the exhaust system and is released into the environment as unburned or partially burned hydrocarbons.

217.   If the issue is not addressed or corrected, the excess fuel will burn when it mixes with oxygen inside the catalytic converter and can melt the internal working surfaces of the catalytic converter. As a result, the ability of the catalytic converter to reduce harmful emissions will be compromised.

218.   When the catalytic converter or O2 sensors are compromised, the Check Engine light should illuminate on the display panel informing the driver of a problem. Upon information and belief, the Class Vehicles do not provide notice of an issue to the driver. The result is that drivers are left completely unaware that the dangerous Oil Consumption Defect is also causing the Class Vehicles to have an

emissions system that is defective, pollutes at levels that exceed the intended levels, and violate state and federal emissions standards.

### D. **Ford's Longstanding Knowledge of the Defect**

219. Upon information and belief, Ford was well aware of the Oil Consumption Defect, through a variety of sources including (1) its own records of customers' complaints, (2) its own analysis of warranty and post-warranty claims,[13] (3) comments posted on public websites devoted to automotive reviews and vehicle defect reports, (4) and internal pre-sale durability testing and internal investigations (sometimes referred to as "star" reports).

### 1. **TSBs and SSMs Demonstrate Ford's Longstanding Knowledge of Oil Consumption Issues in Its Vehicles**

220. Ford issues Technical Service Bulletins ("TSBs") and Special Service Messages ("SSMs") to its authorized dealerships in order to provide instructions on how to repair Ford vehicles or respond to particular consumer complaints. These communications are not meant for consumer review. Rather, they are intended to standardize service of Ford's vehicles. Further, these communications often do not reveal the root cause of a problem, only describe a complaint and a remedy,

---

[13] Ford is the only entity that has access to warranty claims and data on a nationwide level. This allows Ford to determine trends in warranty claims and identify issues related to certain defects.

frequently in terms that a lay person would not understand, and do not disclose the severity or scope across all the vehicles to which the TSB or SSM relates.

221.   Evidence of Ford's knowledge of the Oil Consumption Defect are apparent in TSBs and SSMs as early as August 2018.

222.   In August 2018, Ford issued an SSM regarding malfunction indicator lights associated with the camshaft system that might be triggered by low engine oil level  ("SSM 47441").

223.   In November 2018, Ford issued a TSB advising that some 2018 F-150 vehicles equipped with a 5.0L engine may exhibit engine rattle noise under normal deceleration and acceleration maneuvers ("TSB 18-2354").  This type of noise is a telltale sign of under-lubrication in engines.

224.   In December 2018, Ford issued a TSB that regarding malfunction indicator lights associated with the camshaft system that might be triggered by low engine oil level ("TSB 18-2360").

225.   In February 2019, Ford issued an SSM that advised some F-150 vehicles equipped with a 5.0L engine may exhibit a ticking noise at idle after an oil change ("SSM 47787").  Ford stated that the noise is "not detrimental to engine function and has no short- or long-term effect on engine durability."  This type of noise is, however, indicative of under-lubrication.

226.   In March 2019, Ford issued a TSB regarding excessive oil consumption in the 2018 Ford F-150 vehicles equipped with a 5.0L engine ("TSB 19-2058").

    a.    TSB 19-2058 explains that the 5.0L engine in the 2018 F-150 vehicles may exhibit excessive oil consumption with no visible oil leaks. As a result, technicians are instructed to replace the positive crankcase ventilation (PCV) valve as a component of the PCV system.

    b.    After replacement of the PCV valve, the technician is instructed to change the engine oil and oil filter and, inter alia, must explain to the customer that they are to check the oil every 200 miles in order to diagnose the excessive oil consumption.

    c.    After driving the vehicle for not less than 3,000 miles, the customers were instructed to bring the vehicles back to the Ford service center for assessment of the excessive oil consumption. If the amount of oil consumed exceeded 3,000 miles per quart then the technician was instructed to replace the engine long block assembly, i.e. this equates to an entire engine replacement. Ford calculated that a technician would require approximately twelve (12) hours to conduct this repair.

227.   In May 2019, Ford issued a second TSB regarding excessive oil consumption in the 2018 Ford F-150 vehicles equipped with a 5.0L engine ("TSB 19-2133). TSB 19-2133 is generally the same as TSB 19-2058, except for an additional step related to marking and measuring the oil consumption.

228.   In May 2019, Ford issued a TSB ("TSB 19-2144") advising that some 2018-2019 F-150 vehicles may exhibit a light moderate knocking noise at idle. The TSB stated that the noise was "not detrimental to engine function and has no short- or long-term effects on engine durability." This type of sound is, however, indicative of under-lubrication in the engine.

229.   In November 2019, Ford issued a third TSB regarding excessive oil consumption in the 2018 Ford F-150 vehicles equipped with a 5.0L engine and also included the MY 2019 as well ("TSB 19-2338").

    a.   TSB 19-2338 explains that the 5.0L engine in the 2018 and 2019 F-150 vehicles may exhibit excessive oil consumption with no visible oil leaks.

    b.   TSB 19-2338 goes on to state that:

> Engineering analysis of the engine assemblies replaced under warranty for a customer concern of excessive oil consumption has found that the majority of engines did not require replacement. Additional engineering analysis has found an excessive oil consumption condition may have been caused by the powertrain control module (PCM) strategy which purposely closes the throttle

plate during the deceleration fuel shut off (DFSO) events resulting in high intake manifold vacuum which can pull oil past the piston rings and into the combustion chamber. To correct the condition, a revised PCM calibration is in the process of being released to adjust the throttle plate opening angle to reduce engine manifold vacuum during DFSO events.

If the only symptom exhibited is excessive oil consumption do not attempt diagnosis or repairs for this condition at this time. The revised calibration is expected to be available December 2019. Monitor OASIS for updates.

c.   Check the oil level on the oil level indicator. Add oil as necessary to bring the oil level to the MAX fill line on the oil level indicator.

d.   Accordingly, TSB 19-2338 instructed technicians to stop replacing engines and instead do nothing but add oil to the engine "as necessary" to bring the oil level to the MAX fill line on the oil level indicator.

209.   In December 2019, Ford issued a fourth technical service bulletin regarding MY 2018-2019 of the Class Vehicles ("TSB 19-2365").

a.   Similar to TSB 19-2338, TSB 19-2365 attributed the excessive oil consumption to the possibility of high intake manifold vacuum during deceleration fuel shut off (DFSO) resulting in oil being pulled into the combustion chamber. The proposed

correction under the TSB includes reprogramming of powertrain control module ("PCM"), installing a new engine oil level indicator (a/k/a "dipstick"), and changing the engine oil and oil filter.

b.    Most notably, the redesigned dipstick "uses a wider 1.9 liter (2 quart) normal operating range." As a result, and rather than adequately repair the Oil Consumption Defect, Ford simply changed the length of the dipstick to mask the oil consumption problem in the Class Vehicles. On information and belief, the new dipsticks encourage owners to over-fill the engine oil sump and thus prolong the time/mileage interval between filling the engine oil and registering a low oil level reading.  In other words, an oil level that once registered at or below the minimum fill line on the factory-installed dipstick – which would have caused customers to become alarmed or concerned about excessive oil consumption and possibly qualified for an engine replacement under TSB 2058 -- is now considered normal and within Ford's acceptable parameters. This change only sought to save Ford the cost of repairs and did nothing to correct the Oil Consumption Defect.

230.   In January 2020, Ford issued a TSB advising that some 2018-2020 F-150 vehicles might exhibit a light to moderate knocking type noise at idle ("TSB 20-2023").  Ford stated that the noise is "not detrimental to engine function and has no short- or long-term effects on engine durability."  Such noise is, however, an indicator of under-lubrication of the engine.

231.   Plaintiffs allege that Ford knew of the Oil Consumption Defect months before issuing the earliest SSMs and TSBs related to it.  Plaintiffs also allege that on or about March 20, 2017, Ford issued a TSB related to excessive oil consumption in MY 2015-207 Mustangs, notified Mustang owners of the issue, and published a post-sale supplement to the Mustang Owner's Manual regarding the same.  At a minimum, these developments should have alerted Ford to potential problems with the F-150 engine that subsequently debuted in 2018.

## 2.   Numerous Reports to NHTSA Should Have Given Ford Knowledge of the Oil Consumption Defect

232.   The National Highway Traffic Safety Administration ("NHTSA") is a federal agency responsible for ensuring safe roadways and enforcing federal motor vehicle safety standards.  Consumers may file vehicle safety-related complaints with NHTSA's Office of Defects Investigation, where they are logged and published.

233.   NHTSA has received numerous complaints about the Oil Consumption Defect in the few years since this engine model was launched.

234.   NHTSA received the following consumer reports regarding excessive oil consumption in MY 2018 Ford F-150 trucks:

a.   A consumer in GUYTON, GA wrote on February 18, 2021: ON OR ABOUT THE WEEK OF 10/26/2020, I TOOK MY TRUCK TO J.C. LEWIS FORD IN SAVANNAH, GA FOR A TRANSMISSION SHIFTING ISSUE TO BE LOOKED AT. WHILE THERE, THEY ALSO CHECKED THE OIL IN THE VEHICLE AND NOTED IT WAS VERY LOW. AS A RESULT OF THIS, THEY COMPLETED AN ENGINE OIL CHANGE, REPROGRAMMED THE COMPUTER AND REPLACED THE OIL LEVEL INDICATOR PER TSB 19-2365, AND I COULD PICK UP THE TRUCK, WHICH I DID.  THIS PAST TUESDAY, 2/16/2021, I CHECKED THE OIL LEVEL IN MY TRUCK AND FOUND IT TO BE OVER A QUART LOW. THE VEHICLE HAS ONLY HAD A LITTLE OVER 3000 MILES PUT ON IT SINCE THE FORD PROVIDE WARRANTY OIL CHANGE. I PHONED J.C LEWIS FORD AFTER NOTICING THE OIL WAS LOW AND THEY REQUESTED THAT I BRING MY VEHICLE IN TO BE LOOKED AT. THE VEHICLE IS CURRENTLY AT THE DEALERSHIP.

b.   A consumer in AURORA, CO wrote on January 30, 2021: ENGINE OIL IS LEAKING.

c.   A consumer in GALLATIN, TN wrote on December 10, 2020: LEAKS OIL[.]  DEALER CAN[']T STOP THE PROBLEM. CONSTANT LEAK. 2018 SHOULD NOT HAVE THIS TYPE PROBLEM[.] GOING TO CAUSE ENGINE FAILURE. NOT SAFE[.]  THIS IS AN ONGOING ISSUE.

d.   A consumer in PASADENA, MD wrote on July 17, 2020:  MY 2018 FORD F150 HAS AN ISSUE WITH THE ENGINE CAM PHASER MAKING A KNOCKING NOISE DURING STARTUP. I HAD THEM REPLACED BY MY DEALER. I HAVE HAD MY TRUCK BACK TO THE DEALER 4 TIMES DO TO OIL LEAKS AND CHECK ENGINE LIGHTS COMING ON. ALSO I AM HAVING WHAT LOOKS LIKE

65

MY ENGINE OIL MIXING WITH MY COOLANT AND ALSO THE COOLANT MIXING IN MAY OIL. THE DEALER TELLS ME THIS IS NORMAL. I TRIED TO TAKE MY VEHICLE TO THREE DIFFERENT DEALERS AND THEY ALL REFUSED TO WORK ON MY TRUCK THEY SAID TAKE IT BACK TO THE DEALER THAT DID THE ORIGINAL REPAIRS. I CALLED THE DEALER THAT DID THE ORIGINAL REPAIRS AND THEY TOLD ME THEY REFUSED TO WORK ON MY TRUCK SINCE I HAD MY LLAWYER CONTACT FORDS CUSTOMER RELATIONS I HAVE REPAIR ORDERS BUT THE FILE WAS TO LARGE TO ATTACH.

e.    A consumer in TERRE HAUTE, IN wrote on March 11, 2020: TL* THE CONTACT OWNS A 2018 FORD F-150. THE CONTACT STATED THAT WHILE DRIVING AND TURNING LEFT, THE VEHICLE STALLED WITH THE SHIFT TO PARK WARNING DISPLAYED. THE CONTACT STATED THAT THE POWER STEERING ASSIST WAS INOPERABLE. THE CONTACT ALSO STATED THAT THE BACK-UP CAMERA FAILED INTERMITTENTLY. THE VEHICLE WAS TAKEN TO MACE FORD LOCATED AT (4501 US-41, TERRE HAUTE, IN 47802) TWICE TO BE DIAGNOSED. THE MECHANIC WAS UNABLE TO DUPLICATE THE FAILURE OR RETRIEVE A FAULT CODE FOR THE CAUSE OF THE FAILURE. THE CONTACT WAS CONCERNED ABOUT OIL CONSUMPTION. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS APPROXIMATELY 6,000.*DT*JB

f.    A consumer in GLOUCESTER, VA wrote on February 20, 2020: VEHICLE CONSUMED A FEW QUARTS OF OIL BEFORE IT'S NEXT OIL CHANGE WAS DUE. JUST BOUGHT THE TRUCK WITH LOW MILEAGE. NO REASON FOR IT TO CONSUME LIKE THAT. NO LEAKS. NOTICED WHEN A CHANGE OIL SOON WARNING CAME UP AS I BACKED OUT OF MY DRIVEWAY.THOUGH IT WAS ODD CONSIDERING IT WAS PREMATURE. WHEN I CHECKED,

ALMOST NO OIL WAS ON THE DIPSTICK. IT WAS FULL 5 WEEKS AGO WHEN I CHECKED IT LAST.

g.      A consumer in BERKELEY SPRINGS, WV wrote on December 23, 2019:  FIRST COMPLAINT ON AUGUST 21/19. TO HAGERSTOWN FORD DEALERSHIP THAT THIS TRUCK DOES NOT OPERATE CORRECTLY! THE HARDSHIFT CLUCK, USING OIL 1QT LOW AT 2400 MILES, WARPING DASH, RATTLING SOUNDS BAD.(LIKE VALUES RATTLING) MY DOOR LATCHES FREEZE.. I HAVE NOW AS OF 12/23/19 HAVE ADDED A TOTAL OF 5QTS OF OIL TO THIS TRUCK WITH ONLY JUST OVER 5000 MILES ON IT.YOU CAN SMELL BURNED OIL COMING FROM UNDER THE HOOD AND EXHAUST.I HAVE SEVERAL VIDEO DOCUMENTATION TO MY STATEMENT! I SPOKE WITH LARRY WHEN THE TRUCK WAS DROPPED OFF IN NOVEMBER TO HAVE DASH REPLACED FOR A WEEK,TO CALL ME AND TELL ME THEY DIDN'T HAVE THE CORRECT DASH? I HAVE CONTACTED LARRY IN REGARDS TO THIS VECHILE OIL USE IS UNREAL!!! NO NEW VECHILE GOES THROUGH OIL LIKE THIS! I AM TOLD TO KEEP ADDING OIL. WHY ARE YOU NOT COVERING THE OIL, IT'S UNDER WARRANTY?  THIS TRUCK IS BY FAR THE WORST VECHILE I HAVE EVER OWNED!!!!! I FEEL I'M GETTING THE RUN AROUND N IF SOMETHING ISN'T RESOLVE SOON I WILL TAKE FURTHER ACTION. SO I'VE ALSO BEEN ADVISE THAT THE OIL BACKFLOW THAT'S BURNING OUT THE EXHAUST THE FILTERS WILL HAVE OIL CONSUMPTION THROUGH THEM AS WELL!! DID I GET A LEMON! I THINK SO!

h.      A consumer in TERRE HAUTE, IN wrote on December 10, 2019:  BOUGHT THE TRUCK NEW AUGUST 28, 2018 AT 6000 MILES THE TRUCK CONSUMED 3 1/2 QUARTS OF OIL YES THAT'S 6000 MILES SINCE THEN THE TRUCKS HAD AN EXCESSIVE OIL USAGE STILL HASN'T BEEN FIXED 15 MONTHS LATER IT'S BURNED OVER 2 GALLONS OF OIL AND 26,000 MILES FORD REPLACE THE ENGINE AND IT'S BURNING MORE OIL NOW THAN

67

IT EVER HAS IT BURNED 2 QUARTS OF OIL IN 1500 MILES

i.   A consumer in YOUNGSVILLE, LA wrote on October 26, 2019: THE TRANSMISSION WILL TWIST THE DRIVESHAFT AT STARTUP, STATIONARY, AND CAUSE THE REAR END TO POP VERY LOUDLY. I'VE SHOWN FORD ENGINEERING A VIDEO OF IT, I WAS TOLD THAT IT WAS NORMAL. I'VE NEVER HEARD OF A VEHICLE DOING THIS BEFORE. THERE IS A RATTLING SOUND ON DECELERATION, LOUDEST WHEN THE ENGINE IS COLD AND LESSONS OR MAYBE EVEN GOES AWAY AFTER WARMED UP.  THE ENGINE WAS REPLACED EARLIER THIS YEAR BECAUSE OF AN OIL CONSUMPTION ISSUE.  THE TRUCK HAS MEMORY POWER DRIVER'S SEAT AND POWER MIRRORS THAT SHOULD GO INTO PLACE DEPENDING ON THE KEY FOB THAT IT DETECTS.  RANDOMLY BOTH SIDE MIRRORS WILL START MOVING AND POPPING BEFORE GOING BACK INTO POSITION. THIS ALWAYS OCCURS BEFORE THE VEHICLE IS STARTED. I'VE NOTICED THAT IT IS USUALLY WHEN IT DETECTS THE KEY FOB OR WHEN I USE THE FOB FOR SOME FUNCTION.  THE SEAT RANDOMLY DOESN'T GO INTO THE MEMORY POSITION AT STARTUP.

j.   A consumer in CUMMING, GA wrote on September 5, 2019: TRANSMISSION ISSUE: INTERMITTENT LOUD BANG UPON STARTING THE ENGINE. INTERMITTENT RATTLE DURING NORMAL ACCELERATION AND DECELERATION. THERE IS ALSO HARSH UP AND DOWNSHIFTS IN THE VEHICLE. DURING NORMAL DRIVING CONDITIONS, THE VEHICLE WILL BE UP SHIFTING AND THEN IT WILL LOSE POWER UNTIL IT FINDS THE CORRECT GEAR, WHEN IT WILL THEN SLAM INTO GEAR. AGAIN THESE ARE ALL INTERMITTENT AND HARD TO MAKE HAPPEN ON DEMAND. ON OCCASION THE VEHICLE WILL BE SITTING AT A STOP LIGHT AND THE TRANSMISSION WILL BANG INTO ANOTHER GEAR, ALL WHILE BEING

68

COMPLETELY STATIONARY. THE VEHICLE HAS A 13,200 MILES ON IT, AND IS CURRENTLY UNDERGOING AN OIL CONSUMPTION SURVEY THROUGH THE DEALERSHIP DUE TO THE MOTOR BURNING OIL. ALL OF THESE ARE ONGOING ISSUES THAT HAPPEN ON RANDOM DAYS AND TIMES, WHILE BOTH COLD AND WARM.

k.      A consumer in LOGAN, OH wrote on July 31, 2019: TL* THE CONTACT OWNS A 2018 FORD F-150. WHILE DRIVING 60 MPH, THE OIL PRESSURE WARNING INDICATOR ILLUMINATED ON THE INSTRUMENT PANEL. THE CONTACT STATED THAT THE IGNITION TURNED OFF IN THE MIDDLE OF THE ROAD; HOWEVER, SHE MANAGED TO PARK THE VEHICLE ON THE SIDE OF THE ROAD. THE CONTACT CHECKED THE OIL PRESSURE AND ADDED OIL TO THE VEHICLE. THE CONTACT RESTARTED THE VEHICLE AND DROVE HOME. THE CONTACT ASSOCIATED THE FAILURE WITH NHTSA CAMPAIGN NUMBER: 17V672000 (ENGINE). THE VEHICLE WAS TAKEN TO DON WOOD FORD LINCOLN (LOCATED AT 2065 E STATE ST, ATHENS, OH 45701, (740) 593-6642), BUT THEY WERE UNABLE TO DUPLICATE THE FAILURE. THE CONTACT STATED THAT THE FAILURE CONTINUED AND SMOKE APPEARED COMING FROM THE LEFT TAIL PIPE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 22,000.*DT*JB

l.      A consumer in PROCTORVILLE, OH wrote on May 23, 2019: 5.0 V-8. MY TRUCK CONSUMES OVER 2 QUARTS OF OIL EVERY 2500 MILES. FORD SAYS THIS IS NORMAL. MY TRUCK'S FUEL ECONOMY IN ANY DRIVING CONDITIONS IS NEVER BETTER THAN 11.9 MPG'S WHICH SHOULD BE AND WAS MUCH BETTER THAN THIS WHEN I FIRST BOUGHT IT. MY ENGINE KNOCKS. MY ENGINES WHINES AND WHISTLES. MY ENGINE IS DOWN ON POWER NOTICEABLY ON THE INTERSTATE WHICH MAKES DRIVING THE TRUCK DANGEROUS. ALL OF THIS FORD SAYS IS NORMAL. NONE OF THIS IS

69

NORMAL UNLESS IT WAS A 1976 PINTO. THIS TRUCK SHOULD BE REMOVED FROM THE ROAD PERMANENTLY

m.     A consumer in GALVESTON, TX wrote on May 14, 2019: EXCESSIVE OIL CONSUMPTION APPROXIMATELY ONE QUART PER 1000-1500 MILES

n.     A consumer in BLOOMINGTON, IN wrote on April 15, 2019: THIS NEW TRUCK'S, WHICH WAS PURCHASED IN JANUARY OF 2019, 5.0 LITER ENGINE USED 2.5 QUARTS OF ENGINE OIL IN THE FIRST 3500 MILES. THE TRUCK IS CURRENTLY UNDERGOING AN OIL CONSUMPTION TEST AT MY EXPENSE.

o.     A consumer in TUSCALOOSA, AL wrote on July 1, 2018: VEHICLE SHUDDERS AND MAKES A POPPING NOISE FORM ENGINE. SOUNDS LIKE A MISFIRE. CHECK ENGINE LIGHT FLASHES ON SOMETIMES DURING THIS EVENT.   ALSO WHEN CRANKING IT MISFIRES SOMETIMES. THIS HAS BEEN ONGOING SINCE I DROVE THE VEHICLE HOME DAY ONE BRAND NEW.

p.     A consumer in PORT CHARLOTTE FL, wrote on March 16, 2018:   THIS ISSUE IS HAPPENING WIDESPEAD AMONGST OWNERS OF FORD'S NEW 3.5L HIGH OUTPUT POWERTRAIN. UPON OPEN THROTTLE, THE ENGINE WILL INSTANTLY DROP OFF ALL POWER, CAUSING THE TRUCK TO DANGEROUSLY AND UNEXPECTEDLY DROP TO ZERO MILES PER HOUR. VERY DANGEROUS AND LIFE THREATENING WHILE ENTERING ROADWAYS OR INTERSTATE ROADS WITH TRAFFIC. UPON OPEN THROTTLE, A "LOW OIL PRESSURE" LIGHT TAKES OVER THE VIEWING AREA ON THE DASH CLUSTER AND THEN DISAPPEARS AFTER RESTARTING THE VEHICLE. UPON RESTARTING, THE TRUCK WILL FAIL AND PROVIDE A "LOW OIL PRESSURE" SIGNAL AGAIN AFTER APPLYING OPEN THROTTLE. THIS CAN HAPPEN WHEN TAKING OFF FROM A DEAD STOP OR UNDER CRUISING SPEEDS, WHEN OPEN THROTTLE IS APPLIED, THE

ENGINE FAILS AND CUTS OFF ALL POWER. IT DOESNT MATTER IF YOU ARE TURNING OR GOING STRAIGHT, THE ISSUE HAPPENS REGARDLESS. ALWAYS HAPPENS UNDER OPEN THROTTLE. THIS HAS BECOME A WIDESPEAD ISSUE WITH OWNERS OF THE TRUCK FROM MODEL YEAR 2017-2018. FORD NEEDS TO RESPOND AND FIX THIS ISSUE FOR THE SAFETY OF THEIR CUSTOMERS.

q.   A consumer in BEDFORD CORNERS, NY wrote on March 15, 2018:  TL* THE CONTACT OWNS A 2018 FORD F-150. WHILE DRIVING, THE VEHICLE LOST POWER AND THE LOW OIL AND CHECK ENGINE INDICATORS ILLUMINATED. THE VEHICLE WAS TAKEN TO ARROWAY FORD (519 N BEDFORD RD, BEDFORD HILLS, NY 10507) WHERE IT WAS DIAGNOSED THAT THE OIL PUMP FAILED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED. THE FAILURE MILEAGE WAS 1,519.

235.   NHTSA received the following complaints from consumers regarding excessive oil consumption in MY 2019 Ford F-150 trucks.

a.   A consumer in SUTTON, MA wrote on January 3, 2021: OIL CONSUMPTION ENGINE USING AT LEAST 2 QUARTS OF OIL EVERY 1500 T0 2000 MILES  SINCE I BOUGHT THIS VEHICLE I HAVE CHANGED THE OIL TWICE AND EACH TIME IT GOES THREW 2 PLUS QUARTS WITHIN 1500 T0 2000 MILES OF BEING CHANGED..ADDED 5W20 SYNTHETIC OIL EACH TIME 4 TO 5 QTS. SINCE HAVING THE TRUCK. MILEAGE NOW 14,230 THIS IS NOT ACCEPTABLE FOR A NEW ENGINE!

b.   A consumer in LAS CRUCES, NM wrote on July 12, 2020: THE VEHICLE ONLY HAS 13,500 MILES ON IT AND IT CONSUMES OIL DRAMATICALLY AND THERE IS AN OFF THROTTLE RATTLE IN THE ENGINE. ADDITIONALLY, ONE OF THE CYLINDERS DOES NOT APPEAR TO BE FIRING AND IT HAS NO OIL PRESSURE.

71

c.   A consumer in ANNA, IL wrote on July 31, 2019:  EXCESSIVE OIL CONSUMPTION IN FIRST 500 MILES (USED 2 QUARTS) 5.0 LITER ENGINE

d.   A consumer in GILBERT, WV wrote on December 25, 2019: ENGINE BURNING OIL SHUTS DOWN MAKING NOISE IT'S BEEN HAULED IN GARAGE. FOUR TIMES IT'S A NEW PICKUP I'VE NOT HAD BUT TROUBLE OUT OF IT I WON'T IT FIXED

e.   A consumer in FULSHEAR, TX wrote on December 11, 2019: EXCESSIVE OIL CONSUMPTION. I AM A QUART LOW AT JUST UNDER 2000 MI. TIMING CHAIN RATTLE DURING DECELERATION WHEN COLD. WARPED DASH PANEL PASSENGER SIDE.

236.   NHTSA received the following complaints from consumers regarding excessive oil consumption in MY 2020 Ford F-150 trucks.

a.   A consumer in OKLAHOMA CITY, OK wrote on February 20, 2021: MY 2020 FORD F-150 5.0L V8 HAS AN EXCESSIVE OIL CONSUMPTION PROBLEM. THE DAY I TOOK IT TO GET IT'S VERY FIRST OIL CHANGE (JANUARY 2021), BEFORE I DROVE IT TO THE DEALERSHIP TO GET CHANGED, I CHECKED THE OIL LEVEL AND IT WAS LOW. IT ONLY HAD 5K MILES ON IT. THEY CHANGED THE OIL AND TOPPED IT OFF. WHEN I CHECKED IT YESTERDAY (FEBRUARY 19TH, 2021), IT WAS READING HALF FULL ON THE DIPSTICK, WITH 6,600 MILES ON THE VEHICLE.

b.   A consumer in ANOKA, MN wrote on December 16, 2020:  MY NEW 2020 F150 WITH 5.0 V8 TRUCK OVER CONSUMES OIL, ADDING A QUART OF OIL EVERY 1000 MILES. BROUGHT TO DEALER EVERY WEEK AFTER ABOUT 500 MILES AND THEY ADD AT LEAST A HALF QUERY OR MORE EVERY TIME. I BOUGHT IN OCTOBER 2020 AND IN THE FIRST MONTH I WENT THROUGH 4 QTS OF OIL.

     c.     A consumer in ANOKA, MN wrote on November 23, 2020: BOUGHT THE TRUCK NEW OCTOBER 2020 AND CHECKED THE OIL AFTER A MONTH HAVING THE TRUCK HAVING 1600 MILES ON IT AND THERE WAS NO OIL ON THE DIPSTICK. IT'S A 5.0 COYOTE V8. TOOK IT TO THE DEALER IMMEDIATELY AND THEY ADDED 5 QTS OF OIL! THERE IS A TSB OUT WHERE THEY CHANGE PCM SOFTWARE AND REPLACE THE DIPSTICK. SHOULDN'T THIS BE DONE BEFORE I TOOK THE TRUCK HOME IF THEY KNEW ABOUT IT??

     d.     A consumer in CENTREVILLE, VA wrote on November 11, 2020: EXCESSIVE OIL CONSUMPTION. I HAVE ALREADY HAD THE SERVICE APPLIED FROM THE TECHNICAL BULLETIN, BUT NOT MUCH RELIEF FROM THE LOSS OF OIL. I HAVE TO ADD AT LEAST A QUART HALF WAY BETWEEN OIL CHANGES. I WOULD LIKELY LOSE 2 QUARTS OR MORE BETWEEN OIL CHANGES IN TOTAL. I HAVE BARELY 5000 MILES, "FIX" APPLIED AT 2500 MILES. AT 5100 MILES ALREADY OVER A QUART LOW. MOSTLY CITY DRIVING. SOME PULLING OF SMALLER RV TRAILER. TRAILER WEIGHT IS 5800 POUNDS.

     e.     A consumer in ANNISTON, AL wrote on November 2, 2020: OIL CONSUMPTION ON THE 5.0 LITER V8 ENGINE. THE ENGINE IS CONSUMING OIL WITHOUT EVIDENCE OF AN OIL LEAK. FORD HAS A TSB FOR THIS 19-2365 WHICH COVERS YEAR MODEL 2018-2020. THERE ARE OTHER TSBS FOR OLDER YEAR MODELS WITH THIS SAME ENGINE. FORD SAYS LESS THAN 1 QUART OF OIL CONSUMED IN 3000 MILES OR LESS IS NORMAL. THEIR FIX IS A LONGER AND WIDER DIP STICK AND A SOFTWARE UPDATE. THIS DOES NOT FIX THE OIL CONSUMPTION. THERE IS A PROBLEM WITH THE DESIGN OF THE ENGINE BLOCK WITHIN THE CYLINDERS.

237. In addition to the reports that specifically reference the Oil Consumption Defect, there are a similar number of reports describing persistent,

unexplained rattling (a sign of under-lubrication) and total engine failure in new vehicles with very low mileage.  It is likely that these complaints are related to excessive oil consumption, even if the complainants were not aware of the root cause of their car problems.

238.   Under the TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000), all vehicle manufacturers, including Ford, are legally obligated to routinely monitor and analyze NHTSA complaints in order to determine whether vehicles or automotive components should be recalled due to safety concerns.  Thus, Ford has known, or should have known, about these NHTSA/ODI consumer complaints close in time to the dates they were filed.

239.   Moreover, the content, consistency, and number of these complaints should have alerted Ford to the Oil Consumption Defect.

### 3.   Complaints on Heavily Trafficked Internet Forums for Car Owners Should Have Given Ford Knowledge of the Oil Consumption Defect

240.   Consumer complaints regarding the Oil Consumption Defect are present on numerous websites devoted to automotive reviews, automobile repairs, car complaints, Ford vehicles, and even the F-150 truck line specifically.  Over the last four years, thousands of comments have been published on these sites in response to posts related to excessive oil consumption in the Ford F-150 trucks.

241.   On "Ford F-150 Forum – Community of Ford Truck Fans," more than 1,800 comments accumulated under a thread opened to specifically discuss "Excessive Oil Consumption *** TSB-2058***."[14]   More than 80 commenters posted complaints about their personal experiences with the Oil Consumption Defect.

242.   Another dozen links on f150forum.com -- with names like "Gen 3 coyote eats qt of oil every-1k-miles," "2019 F-150 5.0L Consuming Oil," "Anyone riding out 5.0 oil consumption?," and "2018-2020 F150 5.0L - Excessive Oil Consumption ***TSB 19-2365***" specifically reference oil consumption problems.[15] These posts drew more than 1,000 comments which included dozens of commenters posting personal experiences with excessive oil consumption in their Ford F-150s.

---

[14]   https://www.f150forum.com/f118/2018-f150-5-0l-excessive-oil-consumption-tsb-2058-a-440924/ (last visited December 18, 2024) (excerpt attached as Exhibit F)
[15]   https://www.f150forum.com/f118/gen-3-coyote-eats-qt-oil-every-1k-miles-466185/ (last visited December 18, 2024) (excerpt attached as Exhibit G); https://www.f150forum.com/f118/2019-f-150-5-0l-consuming-oil-449559/ (last visited December 18, 2024) (excerpt attached as Exhibit H); https://www.f150forum.com/f118/anyone-riding-out-5-0-oil-consumption-448028/; https://www.f150forum.com/f118/anyone-riding-out-5-0-oil-consumption-448028/ (last visited December 18, 2024) (excerpt attached as Exhibit I); https://www.f150forum.com/f118/2018-2020-f150-5-0l-excessive-oil-consumption-tsb-19-2365-a-463625/ (last visited December 18, 2024) (excerpt attached as Exhibit J).

243.   On ford-trucks.com a few hundred comments have been published in response to a handful of posts addressing oil consumption in Ford F-150s.  These titles – including "Ford replacing 2018 5.0s?" and "2018+ 5.0 Oil Consumption - Ford now says it's software related" elicited two dozen commenters offering personal experiences similar to Plaintiffs' experiences.[16]

**4.    Ford's Internal Testing Should Have Identified the Oil Consumption Defect**

244.   Ford is experienced in the manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, to verify the vehicles it sells are free from defects and align with Ford's specifications and intended use of the Class, including routine highway travel. Indeed, as set forth above, Ford's testing protocols – "well over 10 million customer-equivalent miles of testing" -- are prominently boosted as a selling point in its advertising.

245.   Upon information and belief, Ford performs a four-part durability evaluation on its vehicles before they are released for sale to the general public. The four steps are a virtual analysis, data acquisition, bench testing, and road testing.

---

[16]    https://www.ford-trucks.com/forums/1574819-ford-replacing-2018-5-0s.html (last visited December 18, 2024) (excerpt attached as Exhibit K); https://www.ford-trucks.com/forums/1603254-2018-5-0-oil-consumption-ford-now-says-its-software-related.html (last visited December 18, 2024) (excerpt attached as Exhibit L)

246.    The virtual analysis stage is conducted by Ford engineers. It is designed to identify risk areas early in the development process by using software simulations to identify potential part failures by using advanced mathematical models. This process allows Ford to identify and correct any issues with its vehicles before they are produced and when it is the least costly to remedy.

247.    The data acquisition stage is also conducted by Ford engineers. Ford engineers collect and analyze road load data (data regarding the expected load the vehicles will undergo during their anticipated lifetime).

248.    Bench testing involves testing individual components of the vehicle to simulate real world conditions. Bench testing is designed to verify the overall soundness of a design under controlled conditions. The testing performed typically includes testing various component parts to failure.

249.    Ford was independently obligated to test the F-150's exhaust emissions system's durability for its "useful life" under Clean Air Act regulations. Under the Environmental Protection Agency's rules, truck and engine manufacturers can use one of two methods for testing the exhaust emissions durability—using a chassis dynamometer to test the vehicles after they have run for a given period of time or using a "bench aging" procedure which involves using extreme heat to test certain components, including the catalytic converters.

250.   In either case, certificate holders must test and certify that the vehicles will comply with EPA emissions standards throughout their "useful life," which is currently defined as 120,000 miles. As the Clean Air Act Handbook describes it, "[t]he demonstration of light-duty vehicle emission durability for purposes of certification consists of two elements: (1) emission deterioration (the extent emissions will increase during the vehicle's useful life); and (2) component durability (whether emission-related components will operate properly for the useful life of the vehicle)."   On information and belief, Plaintiffs allege that the Oil Consumption Defect and the damage it causes to the exhaust system would have been shown during such tests.

251.   Thus, through a variety of quality control metrics, Ford knew or should have known of the Oil Consumption Defect in the Class Vehicles prior to and shortly after the time of sale to Class members.

252.   If Ford did not discover the Oil Consumption Defect, its research and testing were insufficient to support Ford's advertising, promoting, marketing, warranting, and selling of the Class Vehicles as suitable and safe for operation and use in the intended and reasonably foreseeable manner.

### E.   Ford's Response to Consumers Presenting the Oil Consumption Defect at Ford Dealerships

253.   The Class Vehicles come with a three-year/36,000 mile Basic Limited Warranty. The Basic Limited Warranty lasts for three years from the date delivery

of the Class Vehicle is taken, or for 36,000 miles on the odometer, whichever occurs first. The Class Vehicles also come with a five-year/60,000 mile Powertrain Warranty. The Powertrain Warranty covers the engine, transmission, and drive systems. Accordingly, the Powertrain Warranty is the applicable warranty related to the Oil Consumption Defect.

254.   Ford instructs vehicle owners and lessees to bring their vehicles to a Ford dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to Ford dealerships with complaints about the Oil Consumption Defect.

255.   Despite Ford's knowledge of the problem—and presumed knowledge of how to appropriately remediate and prevent the Oil Consumption Defect from recurring—Ford has not provided or proscribed a fix for the defect in vehicles under warranty.

256.   Customers report three different actions at Ford dealerships:

a.   advising customers that excessive oil consumption is normal and that significant amounts of oil should be added to the engine on a regular basis between oil change intervals;

b.   adding significant amounts of engine oil, sometimes exceeding the recommended fill level;

79

c.  taking the original dipstick and replacing it with a new one, which is calibrated differently than the original dipsticks – and encourages over-filling the engine oil -- to lengthen the time/mileage intervals between low oil readings.

257.  These customer experiences are consistent with the instructions Ford has issues in its SSMs and TSBs, but none of these service actions actually fixes the Oil Consumption Defect and each of them will allow damage to the combustion, exhaust, and emission systems described above to occur over time.  In fact, Ford's actions are likely exacerbating the damage that the Oil Consumption Defect would cause under ordinary circumstances if no intervention occurred.

258.  Ford's instructions in its SSMs and TSBs reflect service actions that are contrary, moreover, to the recommendations set forth in the Owner's Manual.  The standard recommendation for the F-150 is that the owner should *check* the oil level on a monthly basis.  It does not suggest that owners will need to add oil to the engine every month between oil changes.  Warnings about higher levels of oil consumption (1 quart per 500 miles) and more frequent checks (at every re-fueling) are flagged as an exception from the norm in the Owner's Manual and connected to exceptionally hard driving: "extended time at high engine speeds, high loads, engine braking, hard cornering maneuvers, track and off-road usage."  The Owner's Manual also warns against over-filling the engine oil.

259. Consumers have incurred and will continue to incur expenses related to the Oil Consumption Defect because the service and repairs Ford has provided for do not adequately resolve the Oil Consumption Defect.

### F. Ford's Efforts to Conceal the Defect from Consumers and Deflect Responsibility for Engine Problems onto Consumers

260. As alleged above, Ford has failed to disclose the Ford F-150's excessive oil consumption problem to consumers before or at point-of-sale.  Ford has also refused to acknowledge the defect to vehicle owners.  Plaintiffs further allege that Ford has affirmatively taken steps to conceal the defect.

261. After several editions of the MY2018 Owner's Manual were printed, Ford revised the section addressing oil level monitoring, adding the following advisory:

> "You can drive high performance vehicles in such a way that may lead to higher oil consumption[. T]his includes extended time at high engine speeds, high loads, engine braking, hard cornering maneuvers, track and off-road usage. Under these conditions, oil consumption of approximately 1 quart per 500 miles (1 liter per 800 km) is possible.  As a result, you need to check the engine oil at every refueling and adjust to maintain proper levels to avoid engine damage."

262. Plaintiffs allege that this language – which suggests that only extraordinary use will trigger higher levels of oil consumption – was purposefully worded to not raise alarms with most vehicle owners while attempting to shield Ford from warranty claims arising from the Oil Consumption Defect.

263.   After issuing TSB-2058 in March 2019 that directed dealerships to replace the long engine block in vehicles if excessive oil consumption was detected after the PCV valve was replaced, Ford effectively rescinded that TSB six months later.  In November 2019, Ford advised dealerships that excessive oil consumption may have been caused by high intake manifold vacuum.  Dealerships were directed to not replace engine blocks and to not attempt diagnosis or repair, but instead to add oil to engines until the maximum fill line on the oil level indicator was met.  Plaintiffs allege that Ford designed and directed these actions to mislead consumers about the root cause of the Oil Consumption Defect.

264.   In December 2019, Ford began issuing a redesigned dipstick to customers complaining of excessive oil consumption.  Plaintiffs allege that the redesigned dipstick does not properly read oil levels, and is designed to encourage over-filling the engine oil sump and delay low oil level readings.  Plaintiffs also allege that this action was designed to deprive consumers of the tool that allowed them to accurately monitor oil levels and causes all of the damage associated with over-filling – something that the Owner's Manual warns strongly against.

265.   Ford has issued multiple TSBs since mid-2018 advising that persistent knocking and rattling sounds are not signs of any engine problem and will not have any effect on "engine durability."  Plaintiffs allege that these TSBs were intended to cause dealers and authorized repair shops to assure consumers that these types of

sounds are acceptable when they are actually indicative of low oil levels and under-lubrication of the engine.

## CLASS ALLEGATIONS

266.   Despite Ford's knowledge of the Oil Consumption Defect, it has failed to notify customers of the nature and extent of the problems with Class Vehicles or provide any adequate remedy.  Ford has continued to sell Class Vehicles with the Oil Consumption Defect through its authorized dealers (as required by state law) all over the United States.  Thus, owners of the Class Vehicles face more significant maintenance efforts, higher maintenance and repair costs, and safety risks associated with this defect.  Plaintiffs allege that they, and persons similarly situated, would not have purchased the Class Vehicles, or would have paid less for them, had they known about the Oil Consumption Defect.

267.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> **Connecticut Class:** All individuals who purchased or leased a Class Vehicle in Connecticut.
>
> **Kansas Class:** All individuals who purchased or leased a Class Vehicle in Kansas.
>
> **Louisiana Class:** All individuals who purchased or leased a Class Vehicle in Louisiana.

**Michigan Class:** All individuals who purchased or leased a Class Vehicle in Michigan.

**Mississippi Class:** All individuals who purchased or leased a Class Vehicle in Mississippi.

**Missouri Class:** All individuals who purchased or leased a Class Vehicle in Missouri.

**Kentucky Class:** All individuals who purchased or leased a Class Vehicle in Kentucky.

**California Class:** All individuals who purchased or leased a Class Vehicle in California.

**Florida Class:** All individuals who purchased or leased a Class Vehicle in Florida.

268.   Excluded from the Class and state Classes ("Classes") are Ford, its employees, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries and affiliates; Ford dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Classes; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

269.   This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Federal Rule of Civil Procedure 23.

270.   Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of

all Class members is impracticable. Class Vehicles may be identified during the pendency of this action and all owners and lessors notified by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class members may be easily derived from Ford's sales records.

271.    <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.    Whether Ford engaged in the conduct alleged herein;

b.    Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c.    Whether the Oil Consumption Defect constitutes a safety defect;

d.    Whether Ford knew about, and failed to disclose, the Oil Consumption Defect at the time Plaintiffs and the Class members purchased their Class Vehicles;

e.    Whether Ford manufactured, marketed, and distributed the Class Vehicles knowing that the Oil Consumption Defect could and would occur;

f.    Whether Ford's conduct violates consumer protection statutes, false advertising laws, and other laws as asserted herein;

g.    Whether Ford owed a duty to warn Plaintiffs and Class Members about the Oil Consumption Defect;

h.    Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

      i.     Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

      j.     Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

272.   Typicality. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

273.   Adequacy. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

274.   Declaratory and Injunctive Relief. Federal Rule of Civil Procedure 23(b)(2): Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief with respect to the Classes as a whole.

275.   Superiority. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Classes to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## TOLLING OF STATUTES OF LIMITATION

276.  Any applicable statute(s) of limitations has been tolled by Ford's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Oil Consumption Defect until shortly before this class action litigation commenced.

277.  Ford was and remains under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the Class Vehicles, that this defect is based on poor manufacturing or poor design or a combination of both, and that it will require costly repairs, poses a safety concern,

and diminishes the resale value of the Class Vehicles. As a result of the active concealment by Ford, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## CAUSES OF ACTION

### A.   Claims on Behalf of the Connecticut Class

### COUNT 1
### VIOLATIONS OF THE CONNECTICUT UNLAWFUL TRADE PRACTICE ACT
### CONN. GEN. STAT. § 42-110A, *ET SEQ*

278.   Plaintiffs incorporate by reference all allegations of preceding paragraphs as though fully set forth herein.

279.   Plaintiff Michael Lepore ("Connecticut Plaintiff") bring this cause of action on their own behalf and on behalf of the members of the Connecticut Class.

280.   Ford, Connecticut Plaintiff, and the Connecticut Class Members are "persons" within the meaning of the Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

281.   Ford engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

282.   The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

283.   Ford engaged in unfair or deceptive trade practices that violated the Connecticut UTPA as described below and alleged throughout the complaint. By failing to disclose the Oil Consumption Defect, by concealing the Oil Consumption Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Oil Consumption Defect in the course of its business.

284.   Ford engaged in unfair or deceptive practices prohibited by the Connecticut UTPA, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

285.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

286.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

287.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

288.   Ford knew or should have known that its conduct violated the Connecticut UTPA.

289.   Connecticut Plaintiff and the Connecticut Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

290.   Had Connecticut Plaintiff and the Connecticut Class Members known that the Class Vehicles would exhibit the Oil Consumption Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

291.   Connecticut Plaintiff and the Connecticut Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Connecticut Plaintiff and the Connecticut Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

292.  As a result of Ford's conduct, Connecticut Plaintiff and the Connecticut Class Members were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

293.  As a direct and proximate result of Ford's unfair or deceptive acts or practices, Connecticut Plaintiff and the Connecticut Class Members suffered and will continue to suffer injury in fact and/or actual damages.

294.  Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Class Members seek an order enjoining Ford's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

295.  Connecticut Plaintiff and the Connecticut Class members justifiably relied on Ford's misrepresentations and have been damaged thereby in an amount to be determined at trial.

## COUNT 2
## FRAUDULENT CONCEALMENT
## (CONNECTICUT COMMON LAW)

296.  Plaintiffs incorporate by reference all allegations of preceding paragraphs as though fully set forth herein.

297.  Connecticut Plaintiff brings this claim on behalf of himself and the Connecticut Class.

298.   At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

299.   Ford sold and/or leased the Class Vehicles throughout the United States.

300.   Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

301.   Rather than inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

302.   Ford's omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

303.   Ford omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

304.   Connecticut Plaintiff and the Connecticut Class Members had no way of knowing about the Oil Consumption Defect.

305.   Connecticut Plaintiff and the Connecticut Class Members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

306.   Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfill these duties.

307.   Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

308.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**B.   Claims on Behalf of the Kansas Class**

**COUNT 3**
**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**
**KAN. STAT. ANN. § 50-623, *ET SEQ.***

309.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

310.   Plaintiff Dan Bryan ("Kansas Plaintiff") bring this cause of action on their own behalf and on behalf of the members of the Kansas Class.

311.   Ford is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

312.   Kansas Plaintiff and the Kansas Class Members, who purchased or leased one or more Class Vehicles, are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b).

313.   The sale or lease of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

314.   The Kansas CPA states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs The Kansas CPA states that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50- 626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval,

accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs.

315.   Ford engaged in unfair or deceptive trade practices that violated the Kansas CPA as described below and alleged throughout the complaint. By failing to disclose the Oil Consumption Defect, by concealing the Oil Consumption Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Oil Consumption Defect in the course of its business.

316.   Ford engaged in unfair or deceptive practices prohibited by the Kansas CPA, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

317.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression

or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

318.  Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

319.  Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

320.  Ford knew or should have known that its conduct violated the Kansas CPA.

321.  Kansas Plaintiff and the Kansas Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

322.  Had Kansas Plaintiff and the Kansas Class Members known that the Class Vehicles would exhibit the Oil Consumption Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

323.  Kansas and the Kansas Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Kansas Plaintiff and the

Kansas Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

324.   As a result of Ford's conduct, Kansas Plaintiff and the Kansas Class Members were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

325.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Kansas Plaintiff and the Kansas Class Members suffered and will continue to suffer injury in fact and/or actual damages.

326.   Ford's violations present a continuing risk to Kansas Plaintiff and the Kansas Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Ford's deceptive practices are in the hundreds of thousands nation-wide; (2) Ford has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the Oil Consumption defect, the likelihood of continued impact on other consumers is significant.

327.   Pursuant to Kan. Stat. Ann. § 50-634, Kansas Plaintiff and the Kansas Class Members seek monetary relief against Ford measured as the greater of (a)

actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for Kansas Plaintiff and each Kansas Class Member. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

328.   Kansas Plaintiff and the Kansas Class Members also seek an order enjoining Ford's unfair and/or deceptive acts or practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Kansas CPA.

## COUNT 4
## FRAUDULENT CONCEALMENT
## (KANSAS COMMON LAW)

329.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

330.   Kansas Plaintiff brings this claim on behalf of himself and the Kansas Class.

331.   At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

332.   Ford sold and/or leased the Class Vehicles throughout the United States.

333.   Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

334.   Rather than inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

335.   Ford's omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

336.   Ford omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

337.   Kansas Plaintiff and the Kansas Class Members had no way of knowing about the Oil Consumption Defect.

338.   Kansas Plaintiff and the Kansas Class Members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

339.   Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfill these duties.

332.   Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

340.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

### C.   Claims on Behalf of the Louisiana Class

### COUNT 5
### VIOLATION OF THE LOUISIANA PRODUCTS LIABILITY ACT
### LA. REV. STAT. ANN. § 9:2800.52

341.   Plaintiffs incorporate by reference all allegations of preceding paragraphs as though fully set forth herein.

342.   Louisiana Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Louisiana Class.

343.   Ford is and was at all relevant times a "manufacturer" within the meaning of La. Rev. Stat. Ann. § 9:2800.53.

344.   The Class Vehicles are and were at all relevant times "Products" within the meaning of La. Rev. Stat. Ann. § 9:2800.53.

345.   The Oil Consumption Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Louisiana Plaintiff and the Louisiana Class Members.

346.   The Louisiana Products Liability Act ("LPLA") prohibits the manufacture of "a product [that] is unreasonable dangerous in design if, at the time the product left its manufacturer's control: (1) there existed an alternative design for the product that was capable of preventing the claimant's damage, and (2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product." *Id.* § 9:2800:56.

347.   The were numerous alternative designs for the piston ring and tension design, including the system utilized by Ford in the 2017 Ford F-150s.

348.   By failing to disclose the Oil Consumption Defect, by concealing the Oil Consumption Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts

101

relating to the Class Vehicles and Oil Consumption Defect in the course of its business.

349.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

350.   Ford knew or should have known that its conduct violated the LPLA.

351.   Ford failed to provide adequate warning to Plaintiffs and Louisiana Class Members of the Oil Consumption Defect both before the vehicles were sold and in subsequent years, including up to the date of the filing of this Complaint.

352.   Had Louisiana Plaintiff and the Louisiana Class Members known that the Class Vehicles would exhibit the Oil Consumption Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

353.   Louisiana Plaintiff and the Louisiana Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, they were harmed and suffered actual damages, including in the form of the diminished value of their vehicles.

354.   Louisiana Plaintiff and the Louisiana Class Members seek monetary relief, as well as reasonable attorneys' fees; punitive damages, because Ford carried out despicable conduct with willful and conscious disregard of the rights and safety

of others, and because Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages, and any other just and proper relief available under the LPLA.

### D.   Claims on Behalf of the Michigan Class

**COUNT 6**
**VIOLATIONS MICHIGAN CONSUMER PROTECTION ACT**
**MICH. COMP. LAWS § 445.903, *ET SEQ.***

355.   Plaintiffs incorporate by reference all allegations of preceding paragraphs as though fully set forth herein.

356.   Plaintiff Stephanie Pake ("Michigan Plaintiff") brings this cause of action on their own behalf and on behalf of the members of the Michigan Class.

357.   Ford, Michigan Plaintiff, and Michigan Class Members are "persons" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

358.   Ford was and is engaged in "trade" or "commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(g).

359.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact

103

could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

360. Ford engaged in unfair or deceptive trade practices that violated the Michigan CPA as described below and alleged throughout the complaint. By failing to disclose the Oil Consumption Defect, by concealing the Oil Consumption Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Oil Consumption Defect in the course of its business.

361. Ford engaged in unfair or deceptive practices prohibited by the Michigan CPA, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are

not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

362.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

363.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

364.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

365.   Ford knew or should have known that its conduct violated the Michigan CPA.

366.   Michigan Plaintiff and the Michigan Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

367.   Had Michigan Plaintiff and the Michigan Class Members known that the Class Vehicles would exhibit the Oil Consumption Defect, they would not have

purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

368.   Michigan Plaintiff and the Michigan Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Michigan Plaintiff and the Michigan Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

369.   As a result of Ford's conduct, Michigan Plaintiff and the Michigan Class Members were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

370.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Michigan Plaintiff and the Michigan Class Members suffered and will continue to suffer injury in fact and/or actual damages.

371.   Ford's violations present a continuing risk to Michigan Plaintiff and the Michigan Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Ford's deceptive practices are in the hundreds of thousands nation-wide; (2) Ford has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold

and distributed with the Oil Consumption defect, the likelihood of continued impact on other consumers is significant.

372.    Michigan Plaintiff and the Michigan Class Members seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 per each Plaintiff; reasonable attorneys' fees; punitive damages, because Ford carried out despicable conduct with willful and conscious disregard of the rights and safety of others, and because Ford's conduct constitutes malice, oppression, and fraud warranting punitive damages; and any other just and proper relief available under the Michigan CPA.

**COUNT 7**
**FRAUDULENT CONCEALMENT**
**(MICHIGAN COMMON LAW)**

373.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

374.    Michigan Plaintiff brings this claim on behalf of himself and the Michigan Class.

375.    At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

376.    Ford sold and/or leased the Class Vehicles throughout the United States.

377.   Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

378.   Rather than inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

379.   Ford's omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

380.   Ford omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

381.   Michigan Plaintiff and the Michigan Class Members had no way of knowing about the Oil Consumption Defect.

382.   Michigan Plaintiff and the Michigan Class Members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

383.   Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfill these duties.

384.   Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

385.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

E.      **Claims on Behalf of the Mississippi Class**

**COUNT 8**
**VIOLATION OF THE MISSISSIPPI PRODUCTS LIABILITY ACT**
**MISS. CODE ANN. § 11–1–63**

386.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

387.   Mississippi Plaintiff brings this cause of action on his own behalf and on behalf of the members of the Mississippi Class.

388.   Ford is and was at all relevant times a "manufacturer" within the meaning of Miss. Code Ann. § 11–1–63.

389.   The Class Vehicles are and were at all relevant times "Products" within the meaning of Miss. Code Ann. § 11–1–63.

390. The Oil Consumption Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to the Mississippi Plaintiff and the Mississippi Class Members.

391. The Mississippi Products Liability Act ("MPLA") prohibits the manufacture of "a product [] designed in a defective manner," which rendered the product "unreasonably dangerous to the user or consumer," and "the defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought." *Id.*

392. The were numerous alternative designs for the piston ring and tension design, including the system utilized by Ford in the 2017 Ford F-150s.

393. By failing to disclose the Oil Consumption Defect, by concealing the Oil Consumption Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Oil Consumption Defect in the course of its business.

394.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

395.   Ford knew or should have known that its conduct violated the MPLA.

396.   Ford failed to provide adequate warning to Mississippi Plaintiffs and Mississippi Class Members of the Oil Consumption Defect both before the vehicles were sold and in subsequent years, including up to the date of the filing of this Complaint.

397.   Had Mississippi Plaintiff and the Mississippi Class Members known that the Class Vehicles would exhibit the Oil Consumption Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

398.   Mississippi Plaintiff and the Mississippi Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, they were harmed and suffered actual damages, including in the form of the diminished value of their vehicles.

399.   Mississippi Plaintiff and the Louisiana Class Members seek monetary relief, as well as reasonable attorneys' fees; punitive damages, because Ford carried out despicable conduct with willful and conscious disregard of the rights and safety of others, and because Ford's conduct constitutes malice, oppression, and fraud

111

warranting punitive damages, and any other just and proper relief available under the LPLA.

    **F.**    **Claims on Behalf of the Missouri Class**

**COUNT 9**
**VIOLATIONS OF THE MISSOURI MERCHANDISING PRACTICES ACT**
**MO. REV. STAT. § 407.010, *ET SEQ.***

400.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

401.    Plaintiff Charles Williamson ("Missouri Plaintiff") brings this cause of action on behalf of himself and on behalf of the members of the Missouri Class.

402.    Ford, Missouri Plaintiffs and members of the Missouri Class are "persons" within the meaning of the Missouri Merchandising Practices Act ("Missouri MPA"), Mo. Rev. Stat. § 407.010(5).

403.    Ford engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

404.    The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

112

405.   Ford engaged in unfair or deceptive trade practices that violated the Missouri MPA as described below and alleged throughout the complaint. By failing to disclose the Oil Consumption Defect, by concealing the Oil Consumption Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Oil Consumption Defect in the course of its business.

406.   Ford engaged in unfair or deceptive practices prohibited by the Missouri MPA, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

407.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

408.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

409.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

410.   Ford knew or should have known that its conduct violated the Missouri MPA.

411.   Missouri Plaintiff and the Missouri Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

412.   Had Missouri Plaintiff and the Missouri Class Members known that the Class Vehicles would exhibit the Oil Consumption Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

413.   Missouri Plaintiff and the Missouri Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Missouri Plaintiff and the Missouri Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

414.   As a result of Ford's conduct, Missouri Plaintiff and the Missouri Class Members were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

415.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Missouri Plaintiff and the Missouri Class Members suffered and will continue to suffer injury in fact and/or actual damages.

416.   Ford's violations present a continuing risk to Missouri Plaintiff and the Missouri Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Ford's deceptive practices are in the hundreds of thousands nation-wide; (2) Ford has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the Oil Consumption defect, the likelihood of continued impact on other consumers is significant.

417.   Missouri Plaintiff and the Missouri Class Members seek damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Ford's unfair and deceptive

practices, and any other just and proper relief available under Mo. Rev. Stat. § 407.025.

## COUNT 10
## FRAUDULENT CONCEALMENT
## (MISSOURI COMMON LAW)

418.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

419.   Missouri Plaintiff brings this claim on behalf of himself and the Missouri Class.

420.   At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

421.   Ford sold and/or leased the Class Vehicles throughout the United States.

422.   Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

423.   Rather than inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

424.   Ford's omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

425.   Ford omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

426.   Missouri Plaintiff and the Missouri Class Members had no way of knowing about the Oil Consumption Defect.

427.   Missouri Plaintiff and the Missouri Class Members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

428.   Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfill these duties.

429.   Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

430.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Ford's conduct warrants an

assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**G.    Claims on Behalf of the Kentucky Class**

**COUNT 11**
**VIOLATIONS OF THE KENTUCKY CONSUMER PROTECTION ACT**
**KY. REV. STAT. § 367.110, *ET SEQ.***

431.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

432.   Plaintiff Joshua Hammons ("Kentucky Plaintiff") brings this cause of action on behalf of himself and on behalf of the members of the Kentucky Class.

433.   Ford, Kentucky Plaintiffs and members of the Kentucky Class are "persons" within the meaning of the Kentucky Consumer Protection Act ("Kentucky CPA"), Ky. Rev. Stat. § 367.110(1).

434.   Ford engaged in "trade" or "commerce" in the State of Kentucky within the meaning of Ky. Rev. Stat. § 367.110(2).

435.   The Kentucky CPA makes unlawful "unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" Ky. Rev. Stat. § 367.170.

436.   Ford engaged in unfair or deceptive trade practices that violated the Kentucky CPA as described below and alleged throughout the complaint. By failing to disclose the Oil Consumption Defect, by concealing the Oil Consumption Defect,

118

by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Oil Consumption Defect in the course of its business.

437.   Ford engaged in unfair or deceptive practices prohibited by the Kentucky CPA, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; and (3) advertising the Class Vehicles with the intent not to sell them as advertised.

438.   Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

439.   Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

440.   Ford knew that the Class Vehicles and their engines suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

441.   Ford knew or should have known that its conduct violated the Kentucky CPA.

442.   Kentucky Plaintiff and the Kentucky Class Members reasonably relied on Ford's misrepresentations and omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles.

443.   Had Kentucky Plaintiff and the Kentucky Class Members known that the Class Vehicles would exhibit the Oil Consumption Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Ford's misconduct.

444.   Kentucky Plaintiff and the Kentucky Class Members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Kentucky Plaintiff and the Kentucky Class Members were harmed and suffered actual damages in the form of the diminished value of their vehicles.

445.   As a result of Ford's conduct, Kentucky Plaintiff and the Kentucky Class Members were harmed and suffered actual damages as a result of Ford's misrepresentations and omissions with regard to their Class Vehicles' engines because they purchased vehicles which do not perform as advertised.

446.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Kentucky Plaintiff and the Kentucky Class Members suffered and will continue to suffer injury in fact and/or actual damages.

447.   Ford's violations present a continuing risk to Kentucky Plaintiff and the Kentucky Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Ford's deceptive practices are in the hundreds of thousands nation-wide; (2) Ford has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the Class Vehicles continue to be sold and distributed with the Oil Consumption Defect, the likelihood of continued impact on other consumers is significant.

448.   Kentucky Plaintiff and the Kentucky Class Members seek damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Ford's unfair and deceptive practices, and any other just and proper relief available under the Kentucky CPA.

## COUNT 12
## FRAUDULENT CONCEALMENT
## (KENTUCKY COMMON LAW)

449.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

450.   Kentucky Plaintiff brings this claim on behalf of himself and the Kentucky Class.

451.   At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

452.   Ford sold and/or leased the Class Vehicles throughout the United States.

453.   Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

454.   Rather than inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

455.   Ford's omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

456.   Ford omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

457.   Kentucky Plaintiff and the Kentucky Class Members had no way of knowing about the Oil Consumption Defect.

458.   Kentucky Plaintiff and the Kentucky Class Members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

459.   Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfill these duties.

460.   Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

461.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## H.   **Claims on Behalf of the California Class**

### COUNT 13
### VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT CAL. CIV. § 1750, *ET SEQ*

462.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

463.   Plaintiff Gruenke ("California Plaintiff") brings this cause of action on behalf of himself and on behalf of the members of the California Class against Ford.

464.   Ford is a person as that term is defined in California Civil Code § 1761(c).

465.   California Plaintiff and the Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

466.   Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act ("CLRA") by the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

(a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

(a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

(a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

(a)(9) Advertising goods and services with the intent not to sell them as advertised.

467. Ford's unfair or deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

468. Ford knew that the Class Vehicles were defectively manufactured, would consume excessive amounts of engine oil, and were not suitable for their intended use.

469. Ford was under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles because:

    a.    Ford was in a superior position to know the true state of facts about a defect that affects vehicle safety and the vehicle damage and repair costs associated with the Oil Consumption Defect in the Class Vehicles and their engines;

    b.    California Plaintiff and the California Class Members could not reasonably have been expected to learn of or discover that the Class Vehicles and their engine had a dangerous safety defect prior to purchase or even before experiencing a malfunction;

    c.    Ford knew that California Plaintiff and the California Class Members could not reasonably have been expected to learn or discover the Oil Consumption Defect and the associated repair costs that it causes prior to purchase; and

d.    Ford actively concealed the defect and the associated repair costs by asserting to California Plaintiff and the California Class Members that the levels of engine oil consumption were considered normal, despite knowing the repairs needed to correct the defect.

470.   In failing to disclose the Oil Consumption Risk and the associated safety risks and repair costs that result from it, Ford has knowingly and intentionally concealed material facts and breached its duty to disclose.

471.   The facts concealed or not disclosed by Ford to California Plaintiff and the California Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Ford's Class Vehicles or pay a lower price. Had California Plaintiff and the California Class Members known about the defective nature of the Class Vehicles and their engines, they would not have purchased or leased the Class Vehicles or would have paid less for them.

472.   California Plaintiff provided Ford with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a) on August 6, 2025.

473.   California Plaintiff's and the other California Class Members' injuries were proximately caused by Ford's fraudulent and deceptive business practices.

474.   Therefore, California Plaintiff and the California Class Members seek all relief available under the CLRA, including monetary, compensatory, and punitive damages, as well as injunctive relief.

## COUNT 14
## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW
## CAL. BUS. & PROF. CODE § 17200

475.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

476.   California Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the California Class against Ford.

477.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

478.   Ford has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the California Class Members of the Class Vehicles' defect and of the costs, safety risks, and diminished value of the vehicles as a result of the defect. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Oil Consumption Defect, and California Plaintiff and California Class

Members could not reasonably be expected to learn or discover the true facts related to the defect.

479.   The Oil Consumption Defect constitutes a safety issue because it can cause the Class Vehicles to run out of engine oil and fail, and as such, Ford had a duty to disclose the safety issue to consumers.

480.   These acts and practices have deceived California Plaintiff and the California Class Members and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from California Plaintiff and the California Class Members, Ford breached its duties to disclose these facts, violated the UCL, and caused injuries to California Plaintiff and the California Class Members. The omissions and acts of concealment by Ford pertained to information that was material to California Plaintiff and the California Class Members, as it would have been to all reasonable consumers.

481.   The injuries suffered by California Plaintiff and the California Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that California Plaintiff and the California Class Members should have reasonably avoided.

482.   Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, et seq., and California Commercial Code § 2313.

483.   California Plaintiff and the California Class Members seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and to obtain all other relief allowed under California Business & Professions Code § 17200.

**COUNT 15**
**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW CAL.**
**BUS. & PROF. CODE § 17500, *ET SEQ.***

484.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

485.   California Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the California Class against Ford.

486.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

487.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including California Plaintiff and the other California Class Members.

488.   Ford has violated section 17500 because the misrepresentations and omissions regarding the durability, reliability, efficiency, functionality, and safety of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

489.   California Plaintiff and the other California Class Members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, California Plaintiff and the other California Class Members relied on the misrepresentations and/or omissions of Ford with respect to the durability, reliability, efficiency, functionality, and safety of the Class Vehicles. Ford's representations were untrue because the Class Vehicles suffer from the Oil Consumption Defect. Had California Plaintiff and the other California Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, California Plaintiff and the other

California Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

490.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

491.   California Plaintiff, individually and on behalf of the other California Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices and to restore to California Plaintiff and the other California Class Members any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT 16
## FRAUDULENT CONCEALMENT
## (CALIFORNIA COMMON LAW)

492.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

493.   California Plaintiff brings this claim on behalf of himself and the California Class.

494.   At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

495. Ford sold and/or leased the Class Vehicles throughout the United States.

496. Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

497. Rather than inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

498. Ford's omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

499. Ford omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

500. California Plaintiff and the California Class Members had no way of knowing about the Oil Consumption Defect.

501. California Plaintiff and the California Class Members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

502.   Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfill these duties.

503.   Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

504.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## I.   Claims on Behalf of the Florida Class

### COUNT 17
### Violations of the Florida Deceptive and Unfair Trade Practices Act
### F.S.A. §§ 501.201, *et seq.*

505.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

506.   Plaintiffs Jacob Benavides and Danielle Beller ("Florida Plaintiffss") bring this cause of action on their own behalf and on behalf of the members of the Florida Class.

507. Ford's business acts and practices alleged herein constitute unfair, unconscionable, and/or deceptive methods, acts, or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq.*, Florida Statutes ("FDUTPA").

508. At all relevant times, Florida Plaintiffs and the Florida Class Members were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

509. Ford's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

510. The practices of Ford, described above, violate the FDUTPA for, *inter alia*, one or more of the following reasons:

   a. Ford represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

   b. Ford provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data, and other information to consumers regarding the performance, reliability, quality, and nature of the Ford F-150 trucks;

   c. Ford represented that goods or services were of a particular standard, quality, or grade, when they were of another;

d.      Ford engaged in unconscionable commercial practices in failing to reveal material facts and information about the Ford F-150 trucks, which did, or tended to, mislead Florida Plaintiffs and the Florida Class Members about facts that the consumer could not reasonably know;

e.      Ford failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

f.      Ford caused Florida Plaintiffs and the Florida Class Members to suffer a probability of confusion and a misunderstanding of legal rights, obligations, and/or remedies by and through its conduct;

g.      Ford failed to reveal material facts to Florida Plaintiffs and the Florida Class with the intent that Florida Plaintiffs and the Florida Class Members rely upon the omission;

h.      Ford made material representations and statements of fact to Florida Plaintiffs and the Florida Class Members that resulted in Florida Plaintiffs and the Florida Class Members reasonably believing the represented or suggested state of affairs to be other than what they actually were;

135

511.   Ford intended that Florida Plaintiffs and the Florida Class Members rely on their misrepresentations and omissions, so that Florida Plaintiffs and the Florida Class Members would purchase Ford F-150 trucks.

512.   Ford's actions impact the public interest because Florida Plaintiffs and the Florida Class Members were injured in exactly the same way as thousands of others purchasing and/or leasing the vehicles with Ford F-150 trucks as a result of and pursuant to Ford's generalized course of deception.

513.   Had Florida Plaintiffs and the Florida Class Members known of the defective nature of the Ford F-150 trucks, they would not have purchased or leased Ford F-150 trucks or would have paid less for them.

514.   The foregoing acts, omissions and practices proximately caused Florida Plaintiffs and the Florida Class Members to suffer actual damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution in value of their Ford F-150 trucks, and he is entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

## COUNT 18
## FRAUDULENT CONCEALMENT
## (FLORIDA COMMON LAW)

515.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

516.   Florida Plaintiffs bring this claim on behalf of themselves and the Florida Class.

517.   At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

518.   Ford sold and/or leased the Class Vehicles throughout the United States.

519.   Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

520.   Rather than inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

521.   Ford's omissions were material because the Oil Consumption Defect has a substantial impact not simply on the convenience and cost of vehicle maintenance, but also on the reliability and safety of the Class Vehicles over time.

522.   Ford omitted this material information to drive up sales and maintain its market power, as consumers would not have purchased the Class Vehicles, or would have paid substantially less for them, had they known the truth.

523.   Florida Plaintiffs and the Florida Class Members had no way of knowing about the Oil Consumption Defect.

524.   Florida Plaintiffs and the Florida Class Members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

525.   Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfill these duties.

526.   Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

527.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitors' vehicles. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes defined above, respectfully request that the Court enter judgment against Ford and award the following relief:

A.    Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representatives of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.    An order enjoining Ford from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint, including, without limitation, an order that requires Ford to:

1.    repair, recall, and/or replace the Class Vehicles,
2.    to extend the applicable warranties to a reasonable period of time and to so notify the Classes,
3.    to stop selling Class Vehicles with the misleading information and omissions and Oil Consumption Defect, and
4.    at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Oil Consumption Defect;

C.    An order granting declaratory relief, including without limitation, a declaration:

1.    requiring Ford to comply with the various provisions of law cited above and to make all required disclosures;
2.    stating that Ford is financially responsible for all Class notice and the administration of Class relief;

D.    An award of appropriate damages to repair or replace the Class Vehicles, including damages for economic loss including loss of the benefit of the bargain, overpayment damages, diminished value and out-of-pocket losses;

E.      An order requiring disgorgement, for the benefit of the Class, the

ill-gotten profits Ford received from the sale or lease of the Class Vehicles, or full

restitution to Plaintiffs and members of the Classes;

F.      An order awarding any applicable statutory damages, civil

penalties, and punitive and exemplary damages;

G.      An award of costs, expenses, and attorneys' fees;

H.      An order requiring Ford to pay both pre- and post-judgment

interest on any amounts awarded;

I.      Such other or further relief as the Court may deem just and

proper.

## **<u>JURY DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial

on all issues so triable.

Dated: August 28, 2025                    Respectfully submitted,

*/s/ Dennis A. Lienhardt*
E. Powell Miller (P39487)
Dennis A. Lienhardt (P81118)
Dana E. Fraser (P82873)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
dal@millerlawpc.com
def@millerlawpc.com

Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF** LLC
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326
mds@sstriallawyers.com
jbk@sstriallawyers.com

Douglas J. McNamara
Madelyn Petersen
**COHEN MILSTEIN SELLERS &
TOLL PLLC**
1100 New York Ave. NW
Suite 800
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dmcnamara@cohenmilstein.com
bejohnson@cohenmilstein.com

William H. Anderson
**HANDLEY FARAH & ANDERSON
PLLC**
4730 Table Mesa Drive
Suite G-200
Telephone: (303) 800-9109
Facsimile: (844) 300-1952
wanderson@hfajustice.com

Jon Herskowitz
**BARON & HERSKOWITZ**
9100 S. Dadeland Blvd.
Suite 1704
Miami, FL 33156
Telephone: (305) 670-0101
Facsimile: (305) 670-2393
jon@bhfloridalaw.com

Steven G. Calamusa
**GORDON & PARTNERS, PA**
4114 Northlake Lake Blvd.
Palm Beach Gardens, FL 33410
Telephone: (561) 799-5070
Facsimile: (561) 366-1485
scalamusa@fortheinjured.com

*Attorneys for Plaintiffs and the
Proposed Classes*